James E. SHEEHAN, Plaintiff Below, Appellant,

v.

OBLATES OF ST. FRANCIS DE SALES; Oblates of St. Francis de Sales, Incorporated, a Delaware corporation; and Salesianum School, Inc., a Delaware corporation, Defendant Below, Appellees.

No. 730, 2009.

Supreme Court of Delaware.

Submitted: Dec. 15, 2010.

Decided: Feb. 22, 2011.

Reargument Denied April 19, 2011.

Thomas S. Neuberger, Stephen J. Neuberger (argued) and Raeann Warner of The Neuberger Firm, P.A., Wilmington, Delaware; Robert Jacobs and Thomas C. Crumplar of Jacobs & Crumplar, P.A., Wilmington, Delaware, for appellant.

Mark J. Reardon, Colleen D. Shields (argued), Penelope B. O'Connell and Peter S. Murphy of Elzufon Austin Reardon Tarlov & Mondell, P.A., Wilmington, Delaware; Of Counsel: Mark E. Chopko (argued) and Marissa A. Parker of Stradley Ronon Stevens & Young LLP, Washington, D.C., for appellees.

Before STEELE, Chief Justice, BERGER, JACOBS, RIDGELY, Justices and NOBLE, Vice Chancellor * constituting the Court en banc.

STEELE, Chief Justice:

James E. Sheehan filed a personal injury action under 10 *Del. C.* § 8145, the Child Victim's Act, against several institutional defendants, including the Oblates of St. Francis de Sales and Salesianum School, for the alleged sexual abuse he suffered in 1962 by Father Francis Norris, a teacher at Salesianum. The Child Victim's Act (CVA), enacted in 2007, abolished the civil statute of limitations for claims of childhood sexual abuse and created a two year window to allow victims of childhood sexual abuse to bring civil suits that the statute of limitations previously barred. After a jury trial, the jury found the Oblates, but not Salesianum, negligent under Section 8145. However, the jury did not find that the Oblates' negligence had proximately caused Sheehan's injuries.

Sheehan asserts that the trial judge committed numerous reversible errors. We reverse and remand for a new trial for two reasons: (1) because the trial judge failed to properly balance, on the record, the probative value of admitting the general causation expert against the unfair prejudice to Sheehan of excluding the testimony; and (2) because the trial judge erred by holding that Section 8145 does not revive intentional torts.

## I. FACTS AND PROCEDURAL HISTORY

James E. Sheehan attended Salesianum School during 1961–1964. While Sheehan was a student at Salesianum, Father Francis Norris, a priest of the Oblates of St. Francis de Sales, was assigned to a teaching position at Salesianum. Sheehan alleges that one night in April 1962, during the spring of his sophomore year, Norris offered him a ride home after a basketball game and Norris forced him to engage in sexual masturbation in the car. Sheehan never reported the incident to the Oblates or to Salesianum. However, Sheehan testified that decades before he had any motive to lie, he told his family members about the sexual abuse.

* Sitting by designation pursuant to Del. Const. Art. IV § 12.

Eyewitness testimony, as well as the Oblates' own business records, demonstrated that the Oblates had prior notice that Norris was an alcoholic and had attempted suicide, and that the Oblates' own doctors urged his immediate psychiatric hospitalization. Sheehan's expert witness testified that in the 1960's priest records used code words to refer to sexual abuse of a child. These code words included "health problems," "depression," "nervous breakdown," and "alcoholism." The expert also testified that alcoholism was not considered a scandal at the time because it was so prevalent in the religious communities of priests. Norris' personnel file was filled with the words "health problems," "depression," and "alcoholism." Shortly before his transfer to Salesianum, his file noted that it was preferable to remove him from his then current locality (New York) and out of direct contact with his present community.

Norris died on March 24, 1985, and the Oblates remained unaware of Sheehan's allegations until Section 8145 became law in July 2007.

In 2007, after a Boston Globe investigation revealed a pattern of sexual abuse against minors by Catholic priests, the Delaware Legislature enacted Section 8145, to repeal the statute of limitations in civil suits relating to child sex abuse.[1] The CVA provided a two year window, during which time prior victims of abuse would be permitted to file civil actions previously barred by the then applicable statute of limitations. The statute also revived claims against institutional defendants who employed or controlled alleged abusers, for claims arising from "gross negligence."

Sheehan filed his complaint against Oblates of St. Francis de Sales, Oblates of St. Francis de Sales, Inc., and Salesianum School, Inc., on November 30, 2007. A seven day jury trial began on November 16, 2009. Sheehan contended at trial that the Oblates were aware of the "red flags" yet failed to keep Norris away from children as required by the educational standard of care in Delaware schools in the 1950s and 1960s.

Before trial, but after completion of discovery, the Oblates had moved for summary judgment on numerous grounds. On October 27, 2009, the Superior Court issued an opinion holding, *inter alia*, that Section 8145 did not revive intentional torts and dismissed Sheehan's fraud count.[2] The court denied the Oblates' remaining motions for summary judgment, including motions challenging the constitutionality of Section 8145.[3] The Oblates also filed a pretrial motion *in limine* to strike the testimony of Sheehan's general causation expert, Diane Mandt Langberg, Ph.D. On November 9, 2009, the trial judge issued an order granting the motion and precluding Langberg from testifying for lack of relevance.[4] The Oblates also moved *in limine* to exclude the testimony of Sheehan's corroborative witnesses who Norris also allegedly abused. The trial judge denied the motion and permitted the witnesses to testify where the alleged abuse of a corroborative witness occurred during the same time Sheehan was abused.

At the prayer conference on November 20, 2009, each party submitted a proposed special verdict form for the trial judge's consideration. The trial judge rejected

1. 76 Del. Laws Ch. 102, § 1 (2007).

2. *Sheehan v. Oblates of St. Francis de Sales., et al.,* C.A. No. 07C–11–234 CLS, at 8 (Del.Super. Oct. 27, 2009).

3. *Id.* at 8–11; *Sheehan v. Oblates of St. Francis de Sales., et al.,* C.A. No. 07C–11–234 CLS, at 5 (Del.Super. Nov. 10, 2009).

4. *Sheehan v. Oblates of St. Francis de Sales., et al.,* C.A. No. 07C–11–234 CLS, at 2 (Del.Super. Nov. 9, 2009).

Sheehan's version, which contained the standard of "a proximate cause," in favor of a special verdict form with the language of "the proximate cause." Sheehan did not object to the language of the special verdict form at trial. The trial judge further ruled that the 1962 Delaware Criminal Code governed the types of sexual acts which Sheehan needed to prove under the CVA rather than the current version of the criminal code.[5]

Following a seven day trial, the jury returned a verdict form that found the Oblates negligent, but not Salesianum. The form further indicated that the jury found that Sheehan had failed to prove that the Oblates' negligence proximately caused his injuries. Consequently, a verdict was entered for the defendant.

On appeal, Sheehan alleges the trial judge erred and abused his discretion by (i) excluding his general causation expert, (ii) using a special verdict form that referred to *"the"* proximate cause rather than *"a"* proximate cause, (iii) that the CVA did not revive intentional torts and (iv) incorrectly applying the 1962 criminal code rather than the current Delaware criminal code. The Oblates have cross appealed, contending that the CVA is unconstitutional either facially or if not facially, as applied. They also contend on cross appeal that the trial judge erred by admitting the testimony of Norris' other alleged victims, because that testimony was unfairly prejudicial and constituted improper character evidence.

## II. ANALYSIS

### A. *The Trial Judge Abused His Discretion by Excluding Sheehan's General Causation Expert.*

 We review a trial judge's decision to exclude expert testimony for an abuse of discretion.[6] If we find that the trial judge abused his discretion, we then consider whether the abuse constituted significant unfair prejudice and denied the appellant a fair trial.[7] When improperly excluded evidence "goes to the very heart of [a] plaintiff['s] case and might well have affected the outcome of the trial, the exclusion of the evidence warrants a new trial."[8]

 The Delaware Uniform Rule of Evidence 702 governs.[9] In applying that Rule, this Court employs a five-step test to determine whether expert testimony is admissible.[10] The trial judge must determine whether: (1) the witness is qualified as an expert by knowledge, skill experience, training or education; (2) the evidence is relevant and reliable; (3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field; (4) the expert testimony will assist the trier of fact to understand

5. *Sheehan v. Oblates of St. Francis de Sales., et al.,* C.A. No. 07C–11–234 CLS, at 4 (Del.Super. Nov. 30, 2009).

6. *Sturgis v. Bayside Health Ass'n Chartered,* 942 A.2d 579, 583 (Del.2007).

7. *Powell v. Dept. of Servs. for Children, Youth & Their Families,* 963 A.2d 724, 736 (Del. 2008).

8. *Barrow v. Abramowicz,* 931 A.2d 424, 429 (Del.2007).

9. D.R.E. 702 states:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

10. *Bowen v. E.I. DuPont de Nemours & Co.,* 906 A.2d 787, 795 (Del.2006).

the evidence or to determine a fact in issue; and (5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[11] In determining whether to admit expert evidence under step (5), D.R.E. 403 [12] requires the trial judge to weigh whether the probative value of the testimony substantially outweighs the danger of unfair prejudice or jury confusion.[13]

In considering the Oblates' motion *in limine* to exclude Langberg's testimony the trial judge concluded that she:

"may be qualified as an expert to testify about general injuries child sex abuse victims suffer, but these generalized conclusions will not be helpful to determine the damages suffered by the Plaintiff in the current case. Without personally examining Plaintiff and basing her opinion on that exam, her testimony is not helpful to assist the trier of fact in determining the damages Plaintiff suffered from the alleged abuse." [14]

The trial judge erred by failing to properly balance, on the record,[15] the probative value of admitting Langberg's testimony against the unfair prejudice to Sheehan of excluding the testimony.[16]

■ "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[17] To determine relevance, we must "examine the purpose for which the evidence is offered" and it "must be of consequence to the action and advance the likelihood of the fact asserted." [18] A litigant has the right to introduce all relevant evidence which goes to the very heart of the case and could affect the outcome of the trial.[19]

■ Sheehan offered two experts at trial, Carol A. Tavani, M.D., a "specific causation" expert, and Langberg, a "general causation" expert. Langberg's testimony was directly and vitally relevant to the most critical issue in the case—proximate cause. Thus, by excluding Langberg's testimony, the trial judge prevented Sheehan from laying the foundation upon which he could build his case for proximate cause. Langberg's testimony was necessary to establish the psychological baseline for the general types of emotional, mental, spiritual and physical injuries that survivors of childhood sexual abuse suffer. That testimony would tend to prove that childhood sexual abuse can in fact cause the types of injuries suffered by Sheehan. Sheehan also offered Langberg's expert testimony on the basis that the injuries typically suffered by child sex abuse victims are unusual and sometimes

11. *Id.*

12. D.R.E. 403 states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

13. *Tolson v. State*, 900 A.2d 639, 645 (Del. 2006).

14. *Sheehan v. Oblates of St. Francis de Sales., et al.*, C.A. No. 07C–11–234 CLS, at 2 (Del.Super. Nov. 9, 2009).

15. *See, e.g., Floudiotis v. State*, 726 A.2d 1196, 1208 (Del.1999).

16. *Timblin v. Kent Gen. Hosp., Inc.*, 640 A.2d 1021, 1023 (Del.1994).

17. *State Farm Mut. Auto. Ins. Co. v. Enrique*, 3 A.3d 1099, 2010 WL 3448534, at *2 (Del. 2010) (TABLE).

18. *Green*, 791 A.2d at 739.

19. *Barrow*, 931 A.2d at 430.

counterintuitive to a layperson and beyond the common experience of any jury. Most importantly, Langberg's testimony would have laid the foundation for and corroborated Tavani's testimony about the actual cause of Sheehan's injuries.

At trial, the Oblates repeatedly objected to Tavani's testimony whenever she attempted to explain Sheehan's injuries in relation to the general effects of sexual abuse on childhood development.[20] Indeed, Tavani's testimony expressly shows how the trial judge's ruling limited her ability to explain Sheehan's injuries. Tavani testified, "I don't know if you want me to talk about—it's a little hard without saying what happens in general and how he exemplified that."[21] Given the complex damages picture this case presented and the centrality of proximate cause to addressing the issue of damages, Langberg's evidence was both relevant and vital to Sheehan's case.

The trial judge reversibly erred by not correctly weighing the probative value of Langberg's general causation evidence against the possibility of unfair prejudice as D.R.E. 403 requires. The excluded evidence goes to the very heart of the proximate cause issue at trial. Given the important nature of expert testimony on the most critical issue in this case, it is clear that this error constituted significant prejudice[22] and that excluding the general causation evidence denied Sheehan a fair trial.

## B. The Trial Judge Did Not Commit Plain Error By Providing a Special Verdict Form That Referred to "The" Proximate Cause, Rather Than "A" Proximate Cause.

As an initial matter, absent plain error, we do not review claims that were not fairly presented to the trial judge.[23] At trial, Sheehan did not object to the use of the phrase "*the* proximate cause" rather than "*a* proximate cause" on the verdict form.[24] Furthermore, a party may not assign error to the giving of a jury instruction without excepting to the charge before the jury retires to consider its verdict.[25]

Sheehan argues that the trial judge committed plain error by providing the jury with a special verdict form that asked the jury to decide whether "either or both of the defendants' liability was *the* proximate cause of the harm to the plaintiff."[26] Plain error review means "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[27] In performing this evaluation, jury instructions must be viewed as a whole.[28] An inaccuracy in the jury instructions is not plain error unless the deficiency undermines the ability of the jury to intelligently perform its duty in returning a verdict.[29]

The special verdict form impliedly instructed the jury to apply an incorrect legal standard which required the Oblates' negligence to be "the" sole proximate

20. Tavani Tr. A851–53; 877–78; 854

21. *Id.* at 854.

22. *Powell,* 963A.2d at 736.

23. Supr. Ct. R. 8; *Rodriguez v. State,* 820 A.2d 372, 2003 WL 1857547, at *1 (Del.2003) (TABLE).

24. App. to Ans. Br. at B00080.

25. Super. Ct. R. 51.

26. App. to Ans. Br. at B00262.

27. *Culver v. Bennett,* 588 A.2d 1094, 1096 (Del.1991).

28. *Probst v. State,* 547 A.2d 114, 119 (Del. 1988).

29. *Id.*

cause rather than "a" proximate cause of Sheehan's injuries. We find, however, that the language in the special verdict form does not constitute plain error when read in context with the entirety of the jury instructions. In their entirety, the instructions contained an accurate statement of the law on proximate cause.[30] The trial judge specifically instructed the jury that there can be more than one proximate cause of an injury.[31] As a general principle, a jury should not have to reconcile two contrary statements of the law.[32] Nonetheless, given Sheehan's failure to object to the verdict form's language before or after the trial judge gave it to the jury to follow in rendering their verdict and given the correct statement of the law in the trial judge's instruction, the incorrect verdict form constituted harmless, not plain, error.

## C. *The Trial Court Incorrectly Held That Section 8145 Does Not Revive Intentional Tort Claims.*

 We review questions of statutory interpretation *de novo* because they involve questions of law.[33] Under Delaware law, remedial statutes should be liberally construed to effectuate their purpose.[34]

Sheehan claims the trial judge erroneously concluded that the CVA did not revive intentional tort claims because it specified the mental state of "gross negligence" as a prerequisite for revival. The problem

is that a *mens rea* finding of intent necessarily includes a lesser included subsidiary finding of gross negligence. The relevant portion of the CVA provides:

(b) For a period of 2 years following July 9, 2007, victims of child sexual abuse that occurred in this State who have been barred from filing suit against their abuser by virtue of the expiration of the former civil statute of limitations, shall be permitted to file those claims in the Superior Court of this State. If the person committing the act of sexual abuse against a minor was employed by ... [a] legal entity that owned a duty of care to the victim, or the accused and the minor were engaged in some activity over which the legal entity had some degree of responsibility or control, damages against the legal entity shall be awarded under this subsection *only if there is a finding of gross negligence on the part of the legal entity.*[35]

We agree with Sheehan that reading the CVA to authorize one form of *mens rea* misses the self-evident intent of the remedial legislation. The relevant language addresses *mens rea*, not a particular cause of action. The trial judge's holding that intentionally breaching a duty does not subsume grossly negligently breaching a duty is manifestly incorrect. Under Delaware law, the hierarchy of mental states (in order of lesser to higher) are negligence, gross negligence, recklessness, intent, and malice.[36] Therefore, by definition a find-

---

**30.** *See* Proximate Cause Jury Instructions App. to Ans. Br. at B00234.

**31.** *Id.*

**32.** *Duphily v. Del. Elec. Co–op., Inc.*, 662 A.2d 821, 834 (Del.1995).

**33.** *Rapposelli v. State Farm Mut. Auto. Ins. Co.*, 988 A.2d 425, 427 (Del.2010).

**34.** *State v. Cephas*, 637 A.2d 20, 25 (Del. 1994).

**35.** 10 *Del. C.* § 8145(b) (emphasis added).

**36.** 11 *Del. C.* § 253 (Whenever a statute provides that negligence suffices to establish an element of an offense, the element is also established if a person acts intentionally, knowingly, recklessly, or with criminal negligence); *see, e.g., Jardel Co., v. Hughes* 523 A.2d 518, 530 (Del.1987) (holding "[c]riminal negligence as defined in 11 *Del. C.* § 231(d) is the functional equivalent of gross negligence as that term is applied as a basis for the recovery of damages for civil wrongs. Gross

ing of an intentional breach of a duty subsumes a grossly negligent breach of that duty. The General Assembly, in Section 8145, made a policy decision to set gross negligence as the floor—not the ceiling—for invoking the statute's applicability. The plain language of the statute sets the specific mental state of gross negligence as the prerequisite for revival of all unspecified causes of action. After all:

> "To the extent that a tort is alleged, that has as its basis, intentional conduct—actual knowledge—those are higher states of mind or worse states of mind than gross negligence ... The Legislature having said that gross negligence is revived, does not have to say that intentional conduct is revived." [37]

We find the trial judge's holding that intentionally breaching a duty does not trigger the statute to be error, because it prevented Sheehan from making additional legal arguments supporting liability against Salesianum. Because the ruling prevented Sheehan from arguing to the jury that Salesianum owed Sheehan a duty of care and intentionally breached that duty of care, we must reverse and remand for a new trial.

## D. The Trial Judge Correctly Ruled that the Criminal Code to be Applied to Claims Under Section 8145 is the Criminal Code in Existence When the Abuse Occurred.

We review questions of statutory interpretation *de novo* because they include questions of law.[38] Under Delaware law, remedial statutes should be liberally construed to effectuate their purpose.[39]

■ 10 *Del. C.* § 8145(a) states that "[a] civil cause of action for sexual abuse of a minor shall be based upon sexual acts that would constitute a criminal offense under the Delaware Code." The trial judge found that the plain language of the CVA did not address which version of the Delaware Code to apply. The trial judge "determined applying anything other than the code in existence at the time of the alleged abuse would be a violation of due process." [40] The judge so concluded because the CVA requires that a claim must be premised upon the commission of a sexual crime.[41] A sexual crime is a predicate element to a civil claim against an institutional defendant for grossly negligently failing to protect a plaintiff from sexual criminal acts of its employee or agent.[42] Moreover, fundamental due process dictates that the scope of liability imposed by a retroactive law cannot substantially change the scope of liability existing at the time of the alleged abuse.[43]

negligence, though criticized as a nebulous concept, signifies more than ordinary inadvertence or inattention. It is nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm.").

37. *Hecksher v. Fairwinds Baptist Church, Inc.*, Super.Ct. Docket No. 09C–06–236–FSS (Del.Super. Oct. 13, 2009).

38. *Rapposelli*, 988 A.2d at 427.

39. *Cephas*, 637 A.2d at 25; *see, e.g., Layfield v. Hastings*, 1995 WL 419966, at *3 (Del.Ch. July 10, 1995) ("[I]t is a traditional principle of statutory construction that remedial statutes are to be construed liberally in order for the goal of the statute to be attained.").

40. *Sheehan v. Oblates of St. Francis de Sales, et al.*, C.A. No. 07C–11–234 CLS, at 2 (Del.Super. Nov. 30, 2009).

41. *See* 10 *Del. C.* § 8145(a).

42. *Id.* at § 8145(b).

43. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (explaining the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place—has timeless and universal appeal); *Doe I v. Boy Scouts of America*, 148 Idaho 427, 224 P.3d 494, 498 (2009) (holding a statute governing tort actions in child abuse cases could not be retroactively

If the current Delaware criminal code were found applicable, the sexual acts alleged in this case could fall within the definition of a criminal offense that did not exist at the time of the alleged abuse. The result would be to create a cause of action where none existed in 1962. The current Code criminalizes multiple sexual acts that were not criminalized in 1962.[44] Under the 1962 Code, the only crime that related to the facts in the record here was lewdly playing with a child under 16 years.[45]

We agree that the CVA's reference to the Criminal Code does not transform this civil statute into a criminal one to which *ex post facto* analysis applies. The Act is and continues to be a civil statute of limitations affecting matters of procedure and remedy.[46] However, an essential predicate to civil claims prosecuted under the CVA is a sexual act that would constitute a criminal offense. If an act was not a crime in 1962, we cannot hold the defendants to reasonably have been on notice of a duty to prevent the now criminalized act from occurring. To hold an institutional defendant liable today for failing to protect a plaintiff from conduct that was not criminal at the time of the conduct violates all notions of fairness by failing to put the defendant on notice that a failure to act could incur civil or criminal liability.

For the above reasons, we hold that the trial judge correctly held that the Criminal Code to be applied to claims under the CVA is the Code that was in existence when the alleged abuse occurred.

### E. *The CVA Violates Neither Federal Nor State Due Process.*

 Constitutional claims are subject to plenary or *de novo* review to determine whether the Superior Court committed an error of law.[47] When our "review is of a constitutional nature, there is a strong presumption that a legislative enactment is constitutional."[48] We resolve all doubts in favor of the challenged legislative act.[49]

### a. The General Assembly Has the Power to Determine the Statute of Limitations and Such A Determination Does Not Violate Article I, Section 9 of the Delaware Constitution.

 Historically, the due process clause of the Delaware constitution[50] has

---

applied to expand liability for perpetration of acts where liability did not previously exist).

**44.** For example: sexual harassment, incest, unlawful sexual contact, sexual extortion, continuous sexual abuse of a child, sexual exploitation of a child, and sexual solicitation of a child. *See e.g.,* 11 Del. C. Part I, Chapter 5, Subchapter II, Subpart D: Sexual Offenses.

**45.** *See* 11 *Del. C.* § 822 (1953): Lewdly playing with a child under 16 years.

Whoever lewdly and lasciviously plays or toys with a child under the age of 16 years may be fined not more than $500 or imprisoned not more than 3 years, or both.

**46.** *See, e.g., Cheswold Volunteer Fire Co. v. Lambertson Constr. Co.,* 489 A.2d 413, 421 (Del.1984) (explaining that "the running of a statute of limitations will nullify a party's remedy" and that a "statute of limitations is . . . a procedural mechanism.").

**47.** *Abrams v. State,* 689 A.2d 1185, 1187 (Del. 1997).

**48.** *Wien v. State,* 882 A.2d 183, 186 (Del. 2005).

**49.** *State v. Baker,* 720 A.2d 1139, 1144 (Del. 1998).

**50.** DEL. CONST. art. I, § 9 ("All courts shall be open; and every man for an injury done him in his reputation, person, movable or immovable possessions, shall have a remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense. Suits may be brought against the State, according to such regulations as shall be made by law.").

substantially the same meaning as the due process clause contained in its federal counterpart.[51] The expression "due process of law, as it appears in the Constitution of the United States, and the expression 'law of the land' as used in the Delaware Constitution, have generally been held to have the same meaning."[52] When considering "a case of due process under our Constitution we should ordinarily submit our judgment to that of the highest court of the land, if the point at issue has been decided by that Court."[53]

The Oblates argue that the expiration of a statute of limitations for a civil action is a fundamental vested right, and once the time has lapsed, a defendant has a vested right in knowing that no person or entity can bring a claim against him. We do not agree. Delaware constitutional due process is coextensive with federal due process.[54] Federal precedent has long held that unless the expiration of a statute of limitation creates a prescriptive property right, such as title in adverse possession, the legislature can revive a cause of action after the statute of limitation has expired.[55] In 1945, the United States Supreme Court concluded that revival of a personal cause of action, that did not involve the creation of title, does not offend the Federal Constitution.[56] Explic-

itly rejecting the fundamental right argument, the Court held that:

> Statutes of limitation find their justification in necessity and convenience rather than in logic ... They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay ... Their shelter has never been regarded as ... a 'fundamental right' ... the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.[57]

As a matter of constitutional law, statutes of limitation go to matters of remedy, not destruction of fundamental rights.[58] Under Delaware law, the CVA can be applied retroactively because it affects matters of procedure and remedies, not substantive or vested rights.[59] Accordingly, the General Assembly "has the power to determine a statute of limitations and such a determination does not violate [Article 1, Section 9] if it is reasonable."[60] Furthermore, we do not sit as an überlegislature to eviscerate proper legislative enactments. It is beyond the province of courts to question the policy or wisdom of an otherwise valid law. Rather, we must take and apply the law as we find it, leaving any desirable changes to the General Assembly.[61]

**51.** *Helman v. State*, 784 A.2d 1058, 1070 (Del. 2001).

**52.** *Opinion of the Justices*, 246 A.2d 90, 92 (Del.1968); *see also* Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 59 (2002).

**53.** *Gen. Elec. Co. v. Klein*, 106 A.2d 206, 210 (Del.1954).

**54.** *Blinder, Robinson & Co., Inc. v. Bruton*, 552 A.2d 466, 472 (Del.1989).

**55.** *Cambpell v. Holt*, 115 U.S. 620, 627–28, 6 S.Ct. 209, 29 L.Ed. 483 (1885).

**56.** *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 316, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945).

**57.** *Id.* at 314, 65 S.Ct. 1137.

**58.** *Id.*

**59.** *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 354 (Del.1993).

**60.** Holland, *supra* note 54, at 60.

**61.** *In re Adoption of Swanson*, 623 A.2d 1095, 1099 (Del.1993).

### b. The CVA, As Applied to the Oblates, Does Not Violate Due Process.

 To prevail on an as applied due process challenge, a defendant must show not only the loss of the witness and/or evidence but also that that loss prejudiced him.[62] The complaining party must specifically identify witnesses or documents lost during delay properly attributable to the plaintiff.[63] Furthermore, the proof must be definite and not speculative. An assertion that a missing witness might have been useful does not show the actual prejudice required.[64]

The Oblates claim that the CVA violates due process as applied to them, because there is no direct evidence that the defendants had notice or knowledge of the risk of abuse that Norris posed. According to the Oblates, this lack of "notice" violates due process, and therefore, it is unjust for them to defend against a claim for gross negligence based on actions that occurred over 40 years ago.

Here, the Oblates fail to demonstrate special hardships, oppressive effects or actual prejudice because there is abundant evidence—including the Oblates' own records demonstrating prior knowledge of Norris' sexual abuse of children and his many other problems—that the Oblates may have violated the educational standard of care for Delaware schools. Additionally, the Oblates were not unduly prejudiced by Norris' death and his inability to testify, because the question to be decided was whether the Oblates and Salesianum had knowledge of Norris' history as an abuser and failed to act in response. A review of the record evidence shows that there was sufficient circumstantial evidence to support the jury verdict.[65] Indeed, the evidence is taken directly from the defendants' own still existing internal records. Furthermore, several of Norris' coworkers are still alive and testified at trial. Therefore, we find the CVA does not violate due process as applied to the Oblates.

## CONCLUSION

The judgment of the Superior Court is REVERSED and the action is REMANDED for proceedings consistent with this Opinion.

---

62. *U.S. v. Mays,* 549 F.2d 670, 677 (9th Cir. 1977).

63. *U.S. v. Bartlett,* 794 F.2d 1285, 1289 (8th Cir.1986).

64. *Mays,* 549 F.2d at 677.

65. *See Seward v. State,* 723 A.2d 365, 369 (Del.1999) (holding there is no distinction between direct and circumstantial evidence).