VALIHURA, Justice, for the Majority: This appeal concerns guns and, as such, has attracted numerous amici curiae raising politically fraught questions concerning gun rights.[1] However, at its core, this case raises straightforward questions of Delaware constitutional and administrative law. We are asked whether unelected officials from the. State’s parks and forest departments, whose power is expressly limited, can ban (except for a narrow exception for hunting) the possession of guns in state parks and forests in contravention of Delawareans’ rights under the State’s constitution. Clearly they cannot. They lack such authority because they may not pass unconstitutional laws, and the regulations completely eviscerate a core right to keep and bear arms for defense of self and family outside the' home—a right this Court has already recognized. As such, the regulations are unconstitutional on their face. Thus, we REVERSE for these reasons and those that follow. ⅜ ⅜ ⅜ Appellants challenge two regulations adopted by two different State agencies that result in a near total ban of firearms in Delaware’s state parks and forests. Appellants are two organizations, namely the Delaware State Sportsmen Association and the Bridgeville Rifle & Pistol Club, Ltd., along with several of their individual members who wish to carry firearms on these State properties. They seek a declaratory judgment that the regulations are unconstitutional: they contend that these regulations compromise their fundamental rights under Article I, Section 20 of the Delaware Constitution, which provides: “A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use.”[2] Although federal courts are still grappling with whether there exists a Second Amendment right to carry a firearm outside the home, our Court settled the issue under our own constitution in our unanimous, en banc opinion in Doe v. Wilmington Housing Authority, by holding that, “[o]n its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation.”[3] We stated that, though not unlimited, Section 20 protects a core right of “defense of self and family in addition to the home” (as all parties here concede).[4] But despite this constitutional requirement, the first of the challenged regulations, Delaware’s Department of Natural Resources and Environmental Control (“DNREC”) Regulation 9201-21.1, provides: It shall be unlawful to display, possess or discharge firearms of any description, air rifles, B.B. guns, sling shots, or archery equipment upon lands or waters administered by the Division, except with prior written approval of the Director.[5] “Division” is defined as DNREC’s Division of Parks and Recreation (“Parks Division”), responsible for more than 23,000 acres of Delaware property (“State Parks”).[6] Section 21.3 provides that, “[n]ot-withstanding subsection[ ] 21.1 [above] ... hunting may be permitted in certain areas at times authorized by the Division ... [and] shall be in accordance with State and Federal laws, rules and regulations.”[7] Breach of Section 21.1 is classified as a class D environmental violation, punishable by a fine “not less than $50 nor more than $100, plus the costs of prosecution and court costs”; repeat violations within five years are punishable by fines ranging from $100 to $500 plus costs.[8] The practical implication of this regulatory scheme is the prohibition of all firearms within State Parks, except with the written permission of the Director or for hunting purposes at certain times in compliance with additional regulations. Similarly, Section 8.8 of Delaware’s Department of Agriculture (“DOA”) Hunting Rules and Regulations provides: Target shooting is prohibited. Firearms are allowed for legal hunting only and are otherwise prohibited on State Forest lands.[9] In effect, the DOA, whose Forest Service oversees the approximately 18,000 acres of Delaware’s three state forests (“State Forests”),[10] also completely bans firearms with a limited exception for legal hunting, which may be pursued only if licensed and selected by lottery to use one of the specifically designated stands.[11] Violations of the DOA’s State Forest Regulations, including the Hunting Rules and Regulations, are unclassified misdemeanors punishable by fines ranging from $25 to $500.[12] And, as under the DNREC regulation, because possession of firearms is banned, the DOA regulation acts as a total ban on carrying firearms for self-defense.[13] The Superior Court upheld the DNREC and DOA regulations (collectively, the “Regulations”) as it believed that they were substantially related to achieving the “important governmental objective of keeping the public safe from the potential harm of firearms in State Parks and Forests” and that the Regulations did not impose an undue burden on Appellants’ Section 20 constitutional rights.[14] But this Court rejected precisely that sort of “general safety concern” justification as insufficient to uphold such regulations in Doe.[15] And the Superior Court’s determination that the Regulations So not unduly infringe on Appellants’ Section 20 constitutional rights because they “remain free to hunt on State lands in accordance with the reasonable restrictions in place”[16] wrongly presumes that the ability to exercise just part of one’s Section 20 rights .(connected to hunting, at limited times) is an adequate substitute for eliminating the core Section 20 right of self-defense entirely in State Parks and Forests! The Superior Court’s decision fails to appreciate that the ability to exercise Section 2Q’s fundamental rights must be meaningful and that the State must preserve an -avenue for carrying out Section 20’s core purposes,[17] which includes the right of possession of lawful firearms for self-defense, including outside the home.[18] The Superior Court’s opinion does not address the express Section 20 right to bear arms for self-defense except to observe that, “the need to respond to a threat with a firearm is diminished when firearms are prohibited in the area,”[19] and that Appellants’ “right to bear • arms to protect, themselves if the need for .self-defense arises is not hindered but, rather, aided in effect by the presence ,of the Regulations.”[20] But that conclusion is premised on the questionable notion—^unsupported by reference to any evidence— that outlawing possession of firearms in an area makes law-abiding citizens .safer because criminals will, for some reason, obey the Regulations. . The limited ability to have a hunting rifle pr shotgun while engaged-in a controlled, hunt ■ on state park or forest land does not fulfill—and cannot substitute for—the people’s right to have a firearm for defense of self and family while camping overnight in a State Park or hiking in the more remote acres of State Forests (assuming compliance with all other laws governing guns). The Regulations not-only unduly burden that constitutional right, but eviscerate it altogether. We acknowledged in Doe that the right to carry a firearm for self-defense is not absolute and may be restricted.[21] For example, the State validly prohibits felons from possessing deadly weapons[22] and limits possession of concealed deadly weapons outside the home to people who hold permits.[23] The issue here is not whether the government may regulate firearms, but whether DNREC and DOA (the “Agencies”) can justify a near total ban on the right to possess a lawful gun to defend one’s self and family with a firearm in Delaware’s State Parks and Forests. The Agencies not only fail to justify such sweeping regulations, but fail to show that they had the authority to enact such unconstitutional regulations in the first place.[24] I. ANALYSIS It is important to understand what is— and is notr—at issue in this appeal. Appellants do not seek “unfettered” or “unregulated” use of firearms in Delaware’s State Parks and Forests. The comprehensive and nuanced restrictions imposed by our General Assembly on the right to keep and bear arms áre not challenged and are not at issue.[25] Rather, Appellants seek to exercise their Section 20 rights, subject to the existing statutory scheme limiting the use of firearms. Accordingly, invalidating the Regulations would merely subject possession and carry' of firearms to the same requirements and limitations that already apply throughout the State. Rather, the issue presented here is twofold: can a fundamental constitutional right be eliminated entirely, or virtually entirely, in State Parks and Forests—not even by our elected General Assembly, but by unelected state administrators? Further, did the Agencies even have the authority to enact the Regulations? A. Standard of Review “Questions of law and constitutional claims are decided de novo.”[26] B. The Evolution of the Regulations at Issue It is useful to start with an explanation of the regulations at issue. 1. Regulating Firearms in State Parks The parties agree that the first version of a firearms restriction in State Parks appears in the minutes of a meeting of the State Park Commission of Delaware on April 10,1962, when the Commission unanimously adopted Rules and Regulations for Use of State Parks.[27] Then-Section 10 provided: “No firearms or fireworks shall be possessed, displayed or discharged on any park area at any time.”[28] In 1968, the Rules were amended and the provision, which moved to Section 9.01, included an exception for those with “prior written permission,”[29] without explaining how to obtain such permission and what qualified as valid permission. In 1969, the Rules were revised again, and the provisions concerning fireworks and firearms split into two subsections, (a) and (b).[30] Section 9.01(b) governing firearms provided: “The display or discharging of firearms upon the lands and waters administered by the Commission is prohibited without prior written permission, except in those areas designated for hunting and trapping by the State Park Commission.”[31] The provision now only forbade “display or discharge[ ],” but not possession. Notably, the provision in Section 9.01(a), relating to fireworks, did ban possession of fireworks.[32] In 1977, the firearms provision moved to Section 8.04 and once again addressed possession as well as the display and discharge of firearms: It shall be unlawful to display, possess or discharge firearms of any description, air rifles, B.B. guns or sling shots upon any lands or waters administered by the Division, except those persons lawfully hunting in those areas specifically designated for hunting by the Division, or except with prior written approval of the Director or his authorized agent.[33] By restoring the ban on “possession]” outside hunting areas, there was now a total ban on firearms in those areas without prior written approval of the Director or his authorized agent.[34] The provision also added the requirement of lawful hunting in order to possess a firearm in the designated hunting areas. For example, Section 10.01(f) established that “[n]o firearms, other than a shotgun, may be used for hunting on areas designated for hunting within State Park lands.” [35] Section 10.01(f) also prohibited all possession of “rifled firearm[s]” in State Parks.[36] The firearms provision did not change until 2004, when it was moved from the section governing “Conduct” to Section 24.0 regarding “Hunting, Fishing and Wildlife Management.”[37] The language of the provision remained substantively unchanged other than adding “archery equipment” to the list of banned objects.[38] The current provision—which is substantively the same as the 2004 version, though split in two subsections—was finalized in March 2016.[39] 2. Regulating Firearms in State Forests In contrast, DOA’s Forest Service did not begin barring the possession of firearms except for hunting until 2003—after the addition of Section 20 to the State Constitution. The earliest Forest Service regulation concerning firearms, from approximately 1979 through 1981 (according to .the Agencies), provided: “[t]he discharge or use of a firearm of any sort is prohibited, except by licensed hunters for game in season. No target shooting is permitted at anytime [sic].”[40] On its face, the regulation did not prohibit possession— only use and discharge. Regulations from 2003 prohibited target shooting and provided: “[fjirearms are allowed for legal hunting only, and are prohibited on State Forest lands from March 1 through August 31.”[41] In 2006, the seasonal date restriction was eliminated such that firearms are “allowed for legal hunting only and are otherwise prohibited on State Forest lands.”[42] C. Article I, Section 20 of the Delaware Constitution When it comes to interpreting provisions of our Delaware Constitution, we have previously highlighted “the significance of knowing the original text, context and evolution of any phrase that appears in the present Delaware Constitution.”[43] Accordingly, we first analyze the text of Section 20 and the context .that surrounds its adoption. We then explain the history of the evolution of the right to bear arms in Delaware. This historical explanation refutes any notion that the rights codified in Section 20 were not pre-existing rights or that they sprang into existence for the first time in 1987 with Section 20’s pas-. sage. • 1. Section 20—Its Text and Evolution We begin with the text of the Constitution/ We have previously observed that “[o]n its face, the Delaware provision is intentionally broader than the Second Amendment.”[44] Comparing the language of the two provisions makes this" clear: Text of Second Amendment: Text of Section 20: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed.” “A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use.” We held in Doe that, given that “Section 20 specifically provides for the defense of self and family in addition to the home,” Section 20 “protects the right to bear arms outside the home.”[45] In contrast, the United States Supreme Court recently denied a writ of certiorari in a case that directly raised' the issue. of whether the Second Amendment protects the right to carry outside the home.[46] However, we need not decide whether the Regulations violate the Second Amendment as Appellants only allege -that they violate Section 20. And our Delaware Constitution may provide “broader or additional rights” than the federal constitution, which provides a “floor” or baseline rights.[47] Thus, the text of Section 20 allows us to begin with the proposition, articulated in Doe and conceded by the State,[48] that Section 20 protects the right to bear arms outside the home. Importantly,- just as we found in Doe that the specific enumeration of “self and family” in addition to the home provides an independent right to bear arms outside the home (and not just in it), the separation of “defense of- self and family” in the text of Section 20 creates a different right from the right to bear, arms “for hunting and recreational use,” which is a separate clause of the provision and permitted under the Regulations in limited circumstances. As part of the Declaration of Rights, Section 20 is covered by the Dela-ware Constitution’s “Reserve Clause,” which declares in bold capitalized letters: “EVERYTHING IN THIS ARTICLE [THE DECLARATION OF RIGHTS] IS RESERVED OUT OF THE GENERAL POWERS OF GOVERNMENT HEREINAFTER MENTIONED”[49] The Reserve Clause has been in our Constitution in substantially its present form since 1792.[50] A prior version of it appeared in Article 30 of the Constitution of 1776,[51] In State v. Bender,[52] we held that the exercise by our General Assembly to amend the Constitution is not the exercise of “a general power of government,”[53] and thus constitutional under the Reserve Clause." We found that the Generál Assembly’s ability to amend the Constitution is- a “very ‘special’ power” given that it requires the “indirect submission to the people of a proposed amendment to the Constitution passed by the General Assembly.”[54] Because constitutional amendments only become effective if two successive General Assemblies vote in favor .of them, the electorate has an opportunity to reject -a proposed - amendment that has been approved by the first General Assembly by engaging with their legislators and, if needed, replacing them with legislators who will voté in accordance with their views.[55] Although we also observed in Bender that the precise meaning of the Reserve Clause may have been “lost in the mists of time,”[56] at a minimum, it must suggest that unelected officials cannot enact regulations which totally ban fundamental rights set forth in-Article I. ■ 2. The Historical Underpinnings of Delaware’s .Right to Bear Arms for Self-Defense ■ The right to bear arms, including the right of self-defense, has existed since our State’s founding and has always been regarded as an inalienable right. We reject the notion that the Regulations were “grandfathered” because various versions of them predate the addition of Section 20: they were unconstitutional before the passage of Section 20, and they are unconstitutional how. This Court recognized in Doe v. Wilmington Housing Authority that “De-laware has a long history, dating back to the Revolution, of allowing responsible citizens to lawfully carry and use firearms in our state.”[57] Delaware is—and always has been—an “open carry” state.[58] Since even before the founding, Delawareans valued their right of self-defense. As this Court has observed, “Like' citizens of our sister states at the founding, Delaware citizens understood that the ‘right of self-preservation’ permitted a citizen to ‘repe[l] force by force’ when ‘the intervention of society in his behalf, may be too late to prevent an injury.’ ”[59] Various militia acts enacted in Delaware’s colonial period described the right of self-defense as “the first Principle and Law of 'Nature,” and emphasized the importance of raising a “well regulated Militia” so that “the Inhabitants may be armed, trained and disciplined in the Art of War, whereby they may be enabled not only to assert the just Rights of his Majesty's Crown, but also to defend themselves, their Lives and Properties, and preserve the many invaluable Privileges they enjoy under their present happy Constitution.”[60] As we noted in Doe, “An individual’s right to bear arms was ‘understood to be an individual right protecting against both public and private violence.’ [61] Further, Article 25 of Dela-ware’s first constitution (enacted on September 20,1776) provided that, unless otherwise altered by the State’s legislature, the common law of England “shall remain in force.”[62] By definition, this included Ar-tide VII of the 1689 English Bill of Rights—described by the United States Supreme Court as “the predecessor to our Second Amendment”[63]—which provided: “That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law.”[64] As noted by the United States Supreme Court in Heller, this “was clearly an individual right, having nothing whatever to do with service in a militia.”[65] Heller made clear that the Second Amendment protects an inherent right of self-defense.[66] Delaware’s ratification of the Bill of Rights in the United States Constitution reinforces that Delaware’s delegates to the constitutional convention viewed the right to keep and bear arms as an inalienable and fundamental right. On..January 22, 1790, the. Delaware House of Assembly ratified the federal Bill of Rights, including the language of what became the Second Amendment.[67] Then, after the Bill of Rights ■ became effective,. Delaware convened its own constitutional convention , to amend its own Declaration of Rights “to enumerate, and more precisely define, the Rights reserved out of the general Powers of Government[.]’’[68] In Doe, we noted- that, “[i]n 1791, Delaware delegates to the state constitutional convention were unable to agree on the specific language that would codify in our Declaration of Rights the right to keep and bear, arms in Delaware,” despite several attempts.[69] For two decades, Delaware’s citizens had been divided on the question of independence from England: the Whigs, who favored independence, and the Tories, who did not, fought for political control.[70] “Concerns over groups of armed men stood in the way of an agreement [on language codifying the right to bear arms].”[71] Mobs of men armed with pistols and other weapons had incited violence in Sussex County as Whigs and Tories sought to prevent each other from voting as they fought for control of Delaware’s legislature.[72] A petition seeking to set aside the results of an October 1787 election in Sussex County alleged that “numbers of persons were beat, wounded and maimed, and the lives of many others threatened by a mob furnished with clubs, pistols, cutlasses, etc.”[73] According to the testimony of the Lewes sheriff, the armed men determined that certain groups of Tories should not vote.[74] However, despite their obvious animosity, as this Court observed in Doe, “there was an apparent consensus among the delegates on an individual’s right’ to bear arms- in self-defense.” [75] The 1792 Convention 'delegates adopted a Preamble that refers to a natural fight of defending life and liberty: “Through Divine Goodness, all men have by-nature, the right of worshipping and serving their Creator according to the dictates of then-consciences, of enjoying and defending life and liberty .[76] All subsequent versions of the Delaware Constitution, including the 1831 and 1897 versions, retained the proclamation that “all men have by nature, the right of ... defending life and liberty” in the first sentence of the preamble.[77] We noted in Doe that, despite consensus on the existence of the right to bear arms, “[n]ot until almost 200 years [after the ratification of the Delaware’s first constitution] did the Delaware General Assembly agree on the language to be used” in explicitly codifying Delaware’s, right to bear arms.[78] Section 20’s legislative history suggests that it was introduced in response to various state and federal court decisions that had recently challenged the view that the Second Amendment protected an individual right to bear arms for self-defense and that it applied to the states.[79] The legislative history underscores that the General Assembly intended to codify the pre-existing right of the people to keep and bear arms, including for self-defense—not create a brand new right. On May 8, 1986, the House of Representatives began the process of amending the Constitution by introducing House Bill 554 (“H.B. 554”) as the “first leg of a constitutional amendment that explicitly protects the traditional lawful right to keep and bear arms.”[80] Aside from three absent representatives, the House unanimously voted in favor of H.B. 554 following debate.[81] In June of 1986, the Senate passed the bill.[82] On January 28, 1987, after a new General Assembly convened, the amendment was reintroduced as House Bill 30 (“H.B. 30”)—“the second leg of a constitutional amendment that explicitly protects the traditional lawful right to keep and bear arms,” according to the synopsis.[83] The House Administration Committee, which considered H.B. 30 that April, “found that this piece of legislation reinforces the provisions currently found in the Delaware Statutes and Constitution.”[84] The bill passed the House and Senate that month with just two nays (in the Senate),[85] establishing Section 20 as part of the Declaration of Rights in the Delaware Constitution and indisputably recognizing the right to bear arms as a fundamental right.[86] More than two decades later, the United States Supreme Court’s decisions in District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), finally settled the questions that had served as an impetus for Section 20. Heller confirmed that the Second Amendment codified an individual right to keep and bear arms separate and apart from the provision’s other purpose of maintaining a well-regulated militia.[87] Given that, “[wjhatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home,” the Court held in Heller that “complete prohibition of their use [as under the District of Columbia’s statute] is invalid.”[88] McDonald found that the Due Process Clause of the Fourteenth Amend-merit incorporated the Second Amendment and therefore, applies to the states:[89] The McDonald Court further emphasized the importance of protecting the right of self-defense given that it is “deeply rooted in this Nation’s history and tradition,”[90] and “a basic right, recognized - by many legal systems from ancient times to the present day”-—“ ‘the central component’ of the Second Amendment right,” as recognized in Heller[91] Both cases confirmed that the core right to, bear arms for self-defense is a traditional or pre-existing right—ie., a right that existed even before being codified.[92] The Heller Court found “[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it ‘shall not be infringed,’”[93] as the Second Amendment “was not intended to lay down a ‘novel principle’ but rather codified a right ‘inherited from our English ancestors,’”[94] Indeed, as explained in Heller, “[b]y'the timé of the founding, the right to have arms had become fundamental for English' subjects.”[95] Blackstone, the prominent authority on English law of the time, “cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen.”[96] Justice Scalia observed that “[Blackstone’s] description of [the right] cannot possibly be thought to tie it to militia or military service. It was, [Blackstone] said, ‘the natural right of resistance and self-preservation,’ and ‘the right of having and using arms for self-preservation and defence.’ ”[97] . It is not a historical accident that Dela-ware’s 1757 Militia Act uses similar language in proclaiming that “[s]elf-preservation is the first Principle' and Law of Nature, and a Duty that every Man indispensably owes not only to himself but to the Supreme Director and, Governor of the Universe, who gave him a Being.”[98] The use of Such language not only reflects the influence of our English common law heritage, but underscores the pre-existing nature of this natural right.[99] Although the United States Supreme Court has not expressly decided whether the Second Amendment protects public carry (i.'e., carrying arms outside the home), the conclusion that self-defense is the Second Amendment’s “core purpose” suggests that it must allow citizens to be armed outside the home given that, “in some circumstances á person may be more vulnerable in a public place than in his own house,”[100] among other reasons. However, regardless of what the United States Supreme Court decides regarding the Second Amendment, in this State, the text of our Delaware Constitution is clear: the light to keep and bear arms exists outside of the home.[101] D. The Regulations Violate Section 20 of Our Constitution Our conclusion that Section 20 affords a right of public carry for self-defense does not resolve entirely the question of whether the Regulations are valid. Like the Second Amendment, Delaware’s right to public carry for self-defense is fundamental but not absolute.[102] We have recognized the validity of several restrictions on gun possession, such as statutes prohibiting the possession of a firearm silencer, sawed-off shotgun, machine gun, or any other firearm or weapon adaptable for use as a machine gun;[103] allowing courts to order people subject to protective orders to relinquish their firearms and ban them from possessing guns;[104] and outlawing possession of a firearm in a public place while under the influence.[105] However, a total ban of possession of firearms for self-defense in Delaware’s State Parks and Forests is not the sort of restriction that passes constitutional muster. As demonstrated above, Section 20 protects a bundle of rights—including hunting, recreation, and the defense of self, family, and State. That one of these rights (i.e., hunting) may be exercised during some parts of the year by some citizens does not result in a “wide class of cases” in which the Regulations can be applied constitutionally so as to enable it to survive a facial challenge.[106] Rather, the total ban on possession for defense of self and family completely eviscerates those rights for the vast majority of ordinary, law-abiding Delawareans at all times in State Parks and State Forests. The Regulations permit only a very limited class of visitors to Delaware Parks and Forests to exercise a narrow sliver of their Section 20 rights (permitted hunting by licensed hunters during designated days as long as they also win the lottery for a stand). It is axiomatic that the State cannot ignore our Constitution, even when acting as proprietor of State-owned property.[107] As in other areas concerning fundamental rights, statutes and regulations impacting Section 20 rights must comply with our Constitution.[108] Heller suggests that “complete prohibition[s]” of Second Amendment rights are automatically invalid and need not be subjected to any tiers of scrutiny.[109] In Wrenn v. District of Columbia, the D.C. Circuit concluded, “[i]t’s appropriate to strike down such ‘total ban[s]’ without bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of an enumerated constitutional right.”[110] The D.C. Circuit persuasively explained that, “[b]y declining to apply tiers of scrutiny to a total ban on ownership, Heller[ ] closed off the possibility that courts would erroneously find some benefits weighty enough to justify other effective bans on the right to keep common arms.”[111] In Wrenn, the statutory scheme at issue banned possession of handguns in the District of Columbia for all citizens other than those who demonstrated a “special need for self-protection” by satisfying the police chief that they had “ ‘good reason to fear to [their] person or property’ or ‘any other proper reason for carrying a pistol,’ ” and included a few limited exceptions.[112] The Court said that the District of Columbia’s scheme operated as a “total ban” because “at a minimum the Amendment’s core must protect carrying given the risks and needs typical of law-abiding citizens”—a right “most D.C. residents can never exercise, by the law’s very design.”[113] As the Seventh Circuit aptly stated, “[b]oth Heller and McDonald suggest that broadly prohibitory laws restricting the core Second Amendment right ... are categorically unconstitutional.”[114] . We applied intermediate scrutiny in Doe[115] because it did not involve a total ban: although the regulation at issue largely restricted the fundamental right to bear arms in the common areas of housing properties managed by the Wilmington Housing Authority (“WHA”), it allowed possession while traveling to and from a resident’s unit and purported to allow firearms for self-defense.[116] ..In contrast, here, the Regulations do not allow any possession of firearms, such as the exception for traveling to and from a resident’s unit in Doe. Moreover, this ban is not even limited to as confined a place as the common areas of properties managed by the WHA, or to as narrow a subset of the population as those properties’ residents or visitors as in Doe. Nor is it limited to what might legitimately be characterized as a “sensitive” place supported by evidence, buttressing the designation of certain areas as such, places. Rather, this ban applies to all 23,000 acres of Parks and 18,000 acres of Forests—spanning an area almost the_size of the entire District of Columbia at issue in Heller[117] and four times the size of the City of Wilmington[118] —and to every segment of the population. Our adoption of intermediate scrutiny in Doe was consistent with the approach that federal circuits have employed when confronting facial challenges to statutes alleged to impinge on Second Amendment rights, yet do not qualify as total bans.[119] Under a “two-pronged” framework forged by the Third Circuit in United States v. Marzarella,[120] they first ask “whether the challenged law imposes a burden on conduct-falling within the scope of the Second Amendment’s guarantee.”[121] If yes, they “evaluate the law under some form of means-end scrutiny,” such as intermediate scrutiny, to determine whether the statute or regulation can survive a , facial challenge.[122] In determining which standard of review or sort of means-end scrutiny should apply, the Seventh Circuit reasonably summarized, “the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law’s burden on the right.”[123] Federal courts understandably vary in their application of this broad framework, but a few principles have emerged. For example, courts are more likely to apply stricter scrutiny to statutes that infringe on the core right of self-defense as opposed to some other right embedded -within the Second Amendment.[124] Further, courts are more likely to apply stricter scrutiny to regulations that limit the rights of all citizens, instead -of merely a “narrow class of individuals who are not at the core of the Second Amendment,” such as convicted felons or the mentally ill.[125] Given that the Regulations not just infringe—but destroy—the core Section 20 right of self-defense for ordinary citizens, one might legitimately argue that we need not apply any level of scrutiny. But even assuming intermediate scrutiny applies, the Regulations still fail. Under intermediate scrutiny, the Agencies have the burden to: first, articulate their important governmental objectives in enacting the Regulations; second, demonstrate that the Regulations are substantially related to achieving those objectives; and, third, show that the Agencies have not burdened the fundamental right to bear arms in self-defense more than is reasonably necessary to ensure that the asserted governmental objectives are met.[126] The Agencies are required to show more than a “general safety concern.”[127] In the proceedings below, the parties submitted cross-motions for judgment on the pleadings and agreed that the matter raises purely legal issues. Thus, no eviden-tiary record was created. The Agencies nonetheless attempted to justify their Regulations by pointing to their general “interest in law enforcement, keeping the peace, and public safety.”[128] The Agencies argued that this interest “in public safety substantially outweighs any individual selfish interest in possession of a firearm,” and that “[i]n fact, private possession of firearms is inconsistent with, and contrary to, preserving public safety.”[129] The Agencies then urged the court to exclude any facts bearing on public safety “in that such considerations are reserved to the legislature in enacting laws, and the executive branch in promulgating regulations, and should have no bearing on the judicial determinations as to Constitutionality.”[130] Thus, the Agencies presented no record support for what can only be characterized as the type of “general safety concern” that we found inadequate in Doe. O'n this basis alone, the Agencies fail the intermediate-scrutiny test. Moreover, the State proffers no basis upon which to conclude that public safety concerns justify a total ban in all acres of Delaware’s parkland and forests—especially given that we observe that open carry and licensed concealed carry is permitted in Delaware’s crowded urban areas such as Wilmington’s Rodney Square under the State’s current regulatory scheme. Further, the Regulations fail as they “burden the right to bear arms more than is reasonably necessary.”[131] Indeed, the Regulations adopted by DNREC and DOA are grossly out of step with the types of “place”-based restrictions adopted by our General Assembly. Our State statutes allowing for “place” restrictions are purposefully narrow and few in number. Aside from prohibiting guns in detention facilities as contraband,[132] the only “place-focused” firearms regulation statute enacted on a statewide basis is 11 Del. C. § 1457, which creates the crime of “possession of a weapon in a Safe School and Recreation Zone.” The statute imposes criminal liability for possessing a firearm or deadly weapon on or near school property, in a school vehicle, or at a recreation center, athletic field, or sports stadium as long as another independent offense is also committed in that place.[133] Section 1457 does not even prohibit concealed carry by licensed persons or open carry by non-prohibited persons of adult age as long as such persons do not commit other crimes. Moreover, the General Assembly has restricted political subdivisions (i.e., counties and municipalities) from regulating the ownership, transfer, possession, or transportation of firearms in areas such as parking lots and parks.[134] Within detailed parameters, counties and municipalities are only permitted to regulate firearms in their governments’ buildings—and they cannot prohibit people with concealed carry licenses from carrying firearms even in these sensitive government buildings.[135] It strains credulity to believe that the General Assembly intended to forbid, for example, elected officials in the historic City of New Castle from enacting firearm regulations, yet allow agency officials to ban firearms in the entirety of Redden State Forest, an area nearly five times larger.[136] The Seventh Circuit observed that “when a state bans guns merely in particular places, such as public schools, a person can preserve ah undiminished right of self-defense by not entering these places[.j”[137] The Agencies make the same argument here.[138] But, here, the Regulations’ sweeping restrictions impose a total ban that forces Delaware citizens to choose between enjoying” our more than 23,000 acres of State Parks and 18,000 acres of Forests on the one hand, and sacrificing what this Court has already unanimously held to be a constitutional right to public carry for defense of self and family on the other.[139] State Parks and State Forests also present a far different “place restriction” than one limiting possession of firearms in a school or courthouse—traditional “sensitive places,” where the courts in Heller and Doe suggested that restrictions might be constitutional.[140] Although there certainly could be some “sensitive” areas in State Parks and State Forests where the carrying of firearms may be restricted, as is done in certain areas of National Parks,[141] there is no record here 'that the State has undertaken any effort to delineate such areas so as not to infringe on Section 20 rights. Further, there are several differences between parks and forests and traditional sensitive places that make the State’s Regulations’ blanket prohibitions problematic.[142] In contrast to a permissible sensitive place such as a courthouse,' where visitors are screened by security, most State Parks and State Forests do not have controlled entry points. One can éasily enter a State Park or State Forest with a weapon— either intentionally or by inadvertently wandering across a State Park boundary while exercising the right to open carry or licensed concealed carry. Whereas courthouses are supervised by law enforcement personnel or easily accessible to law enforcement and other emergency responders,- making the' need to defend oneself with a personal firearm seemingly less acute, State Parks and State Forests are relatively remote and, for example, have less than thirty rangers to police Dela-ware’s entire State Parks.[143] In fact, the DOA’s Hunting Rules and Regulations specifically, warn that the Forest Service is unable to offer protection: “Camping is at your own risk ..... [T]here is np after-hours, nighttime or weekend security.”[144] And, as this Court acknowledged in Doe, the rights of Delaware citizens ,to defend themselves with firearms is especially .critical “when the intervention of society on their behalf may , be too late ..to prevent injury.”[145]'' Responsible, law-abiding Delawareans should not have to give up access to State Parks and State Forests in order to enjoy their constitutional right to carry a firearm for self-defense. Our laws must leave such citizens some reasonable means of exercising their Section 20 constitutionally protected rights.[146] A blanket .place restriction effectuating a total ban on carrying for self-defense that takes no account.of which areas are truly “sensitive” and which are not presents a¡ situation where a . facial challenge must, .succeed.[147] The dissent’s citation to a few supposedly grandfathered local or municipal ordinances under the legislation limiting political subdivisions’ power to regulate firearms proves nothing. In contrast to 22 Del. C. § 835(a)(6), which provides that “[n]othing contained herein shall be construed to invalidate existing municipal ordinances,” Section 20 contains no such grandfathering provision. And thé references to “parks” in 11 Del. C. §§ 1441A and 1441B do not suggest that the General Assembly intended to grandfather the Regulations. These provisions were enacted when Delaware implemented the Federal Law Enforcement Officers Safety Act of 2004, 18 U.S.C. §§ 926B, 926C. The federal statutes and Delaware’s analogues permit active and retired law enforcement officers to carry concealed weapons within or outside of their home jurisdictions irrespective of state laws to the contrary provided that certain conditions are met. Delaware’s statutes were copied directly from the federal statute, and the bill’s' synopsis indicates that the General Assembly intended for them “to mirror the current federal law .[148] There is no suggestion or evidence cited that the General Assembly intended to sanction preexisting regulations concerning firearms in State Parks. The Agencies additionally contend that, under 29 Del. C. § 10141(e), this Court should presume that the Regulations are lawful. But that view ignores the fundamental point that this Court, as the court of last resort for determining questions arising under our Constitution, bears ultimate responsibility for upholding our State Constitution. It cannot defer to unspecified reasons of unelected officials attempting to justify an infringement on a fundamental right.[149] Such a presumption is also inconsistent with the intermediate-scrutiny standard employed in Doe that places the burden on the State to prove that its challenged regulations pass scrutiny- The Agencies’ argument also omits that § 10141(e) provides that, while courts should presume agency action is valid, regulations may be struck down if the complaining party shows the agency action was either “taken in a substantially unlawful manner and that the complainant suffered prejudice thereby,” or that “the regulation, where required, was adopted without a reasonable basis on the record or is otherwise unlawful.”[150] Here, the Regulations are plainly unlawful: they violate the Delaware Constitution. E. The Agencies Lacked Authority to Enact the Regulations [28,29] Relatedly, it is blacldetter law that “administrative agencies ... derive their powers and authority solely from the statute creating such agencies and which define their powers and authority.”[151] “[I]t is axiomatic that delegated power may be exercised only in accordance with the terms of its delegation.”[152] We have stated that “[a]n expressed legislative grant of power or authority to an administrative agency includes the grant of power to do all that is reasonably necessary.to execute that power or authority,” and no more.[153] Pursuant to 7 Del. C. § 4701(a)(4), DNREC may “[m]ake and enforce regulations relating to the protection, care and use of the areas it administers ....”[154] That authority is limited by 29 Del. C. § 8003(7), which states that the Secretary of DNREC may “[establish and promulgate such rules and regulations governing the administration and operation of the Department as may be deemed necessary by the Secretary and which are not inconsistent with the laws of this State ....[155] For its part, the DOA has the power to “devise and promulgate rules and regulations for the enforcement of the state forestry laws and for the protection of forest lands ....”[156] Under 3 Del. C. § 101(3), the DOA is prohibited from adopting rules and regulations that “extend, modify, or conflict with any law of [the State of Dela-ware] or the reasonable implications thereof ... ,”[157] The Regulations fall outside the scope of the Agencies’ authority because they are inconsistent with the laws of this State (namely, Section 20) in violation of 29 Del. a § 8003(7) and 3 Del. C. § 101(3).[158] The evisceration of the right to self-defense and defense of family in the entirety of Delaware State Parks and Forests is inconsistent with Section 20 as the Agencies failed to show that they have not burdened the fundamental right to bear arms for defense of self and family more than reasonably necessary to achieve important government objectives. The State has made no attempt whatsoever to determine which areas of state park and forest lands are truly “sensitive” and which are not. We do not disagree that certain areas, such as places where classes of schoolchildren gather, may be deemed “sensitive.” But the Regulations that completely ban lawful firearms in all areas are invalid, and by failing to conform to 29 Del. C. § 8003(7) and 3 Del. C. § 101(3), the Agencies have exceeded their statutory authority)[159] II. CONCLUSION For. the. reasons set forth above, we REVERSE. . These amici also assert evidence-based arguments which this Court cannot consider given that there is no evidentiary record in the proceeding below. See Briefs for Law Enforcement Action Network; Law Enforcement Legal Defense Fund; Members of the' Dela-ware General Assembly; Retired Delaware Police Officers Hosfelt, Smith, Deputy, Egolf, Monaghan, Briggs, Roe, Brode, Capitán, Kbn-nick arid Guittari; The National Rifle Association of America, Inc.; and The Pink Pistols as Amici Curiae Supporting Appellants. See also Brief for The Law Center to Prevent Gun Violence as Amicus Curiae Supporting Appel-lees. . Del. Const, art. I, § 20.- . Doe v. Wilm. Hous. Auth., 88 A.3d 654, 665 (Del. 2014). (emphasis added). Thus, "our interpretation of Section 20 is not constrained by ... federal precedent...." Id. . Id. (emphasis in original). . 7 Del. Admin. C. § 9201-21.1. . 7 Del. Admin. C. § 9201-1.0; see Public Protected Lands, State of Delaware, https:// data.delaware.gov/Recreation/Public-Protected-Lands/whe2-8n4h/data (last visited Nov. 27, 2017) [hereinafter Public Protected Lands Data]. . 7 Del. Admin. C. § 9201-21.3. . 7 Del. C. § 4702(a); 7 Del. Admin. C. §§ 9201-21 (classification as an Environmental D Violation), -25.1. ' . 3 Del. Admin. C. § 402-8.8. . See Public Protected Lands Data, supra note 6. . See 3 Del. Admin. C. §§ 402-8.2, -11. . Id. § 402-10.2. . Section 8.8 does not even allow possession with the written permission of the DOA’s Agriculture Secretary. Id. § 402-8.8. . Bridgevilie Rifle & Pistol Club, Ltd. v. Small, 2016 WL 7428412, at *5 (Del. Super. Ct. Dec. 23, 2016). As the parties cross-moved for judgment on the pleadings, the Superior Court decided the case based on the motions and the accompanying appendices. Id, at *1 (citing Super. Ct. Civ. R. 56(h)). . Doe, 88 A.3d at 667. . Bridgeville, 2016 WL 7428412, at *5. . See, e.g., Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011) (striking down a firearms regulation that constituted a “serious encroachment on ... the meaningful exercise of the core right to possess firearms for self-defense.”), . Doe, 88 A.3d at 665. .- Id. . Id. . Doe, 88 A.3d at 667. . Id. at 664 (citing Short v. State, 586 A.2d 1203, 1991 WL 12101, at *1 (Del. Jan. 14, 1991)). . Id. (citing Smith v. State, 882 A.2d 762, 2005 WL 2149410, *3 (Del. Aug. 17, 2005)). . At oral argument, the State agreed that Agency power is limited by the Constitution— and in particular that the Regulations are subject to Section 20. See Oral Argument at 40:10, https://livestream.com/accounts/ 5969852/events/7714841/videos/l 62711371/ player ("[T]he Regulations are clearly subject to examination as to whether they satisfy and do not violate that constitutional provision [Article I, Section 20].”). . See, e.g., 11 Del. C. § 602 (prohibiting display of a firearm with the intent to place another in fear of imminent physical injury); id. § 603 (prohibiting guardians from allowing possession or purchase of a firearm by a juvenile); id. § 1441 (allowing retired, police officers to be specially licensed to cany a concealed weapon following retirement); id. §§ 1441A, 1441B (extending federal law regarding retired law enforcement officers’ ability to carry concealed firearms); id. § 1442 (prohibiting a non-law enforcement officer to conceal any firearm without a license); id. § 1444 (prohibiting the possession of a firearm silencer, sawed-off shotgun, machine gun, or any other firearm or weapon adaptable for use as a machine gun); id. § 1445 (prohibiting the sale or transfer of a firearm to a minor); id. §§ 1447, 1447A (criminalizing possession of a firearm during the commission of a felony); id. § 1448 (prohibiting certain persons from owning, using or purchasing firearms); id. § 1448A (requiring a criminal background check prior to the purchase or sale of a firearm); id. §§ 1454, 1455 (criminalizing the act of giving a firearm to a prohibited person or engaging in a sale or purchase of a firearm ón behalf of a person not legally allowed to sell or purchase firearms); id. § 1456 (criminalizing unlawfully permitting a minor access to a firearm); id. § 1459 (prohibiting the possession of a firearm with an obliterated serial number); id. § 1460 (prohibiting possession of a firearm in a public place while under the influence); see also 7 Del. C. § 1707 (prohibiting the training of hunting dogs while carrying a firearm); 9 Del. C. § 330 (prohibiting counties from regulating firearms); 10 Del. C. §§ 2703, 2806 (regulating the possession of firearms by constables); id, § 9224 (requiring drug testing for Justice of the Peace employees permitted to carry firearms); id. § 1045 (allowing court to order temporary relinquishment/ban on possession of firearms in connection with a protective order);, 24 Del. C. §§ 901, 902, 903, 904, 905 (regulating the sale of firearms); id. § 1321 (prohibiting security guards from carrying firearms without proper licensing); 29 Del. C. § 9005(13) (requiring training for officers of Department of Services for Children, Youth and Their Families who carry firearms at work). . Doe, 88 A.3d at 661 (citing Sheehan v. Oblates of St. Francis de Sales, 15 A.3d 1247, 1258 (Del. 2011)). . App. to Appellants’ Opening Br. at A3 68 (State Park Commission of Delaware Apr. 10, 1962, Meeting Minutes): id. at A194 (letter dated Aug. 19, 2016, Agencies’ Response to Superior Court’s request that "counsel provide the language of the Regulations governing firearms through the years, and the dates of any changes”); id. at A448-49 (letter dated Sept. 2, 2016, concerning Defendants’ Response to the Court’s request). The dissent notes that DNREC was created in 1937, see Dissent at 675-76, but it cites no statewide ban on possession of firearms in State Parks until 1962. The dissenters therefore must concede that: (i) there was no continuous ban on possession of firearms in State Parks until 1977; and (ii) there was no continuous ban on possession in Stqte Forests until 2003— after Section 20’s passage. . Id. at A368 (State Park Commission of Delaware Apr. 10, 1962, Meeting Minutes). . Id. at A352 (State Park Commission of Delaware Rules and- Regulations, Effective June 18, 1968, § 9.01). . Id. at A345 (State Park Commission, of Delaware Rules and Regulations, Effective Apr. 26, 1969, § 9.01). . Id. § 9.01(b). . Id. § 9.01(a). . Id. at A325 (State of Delaware Park Rules and Regulations, DNREC Division of Parks & Recreation, Effective May 26, 1977, § 8.04). . No version of the Regulations outlines standards or criteria regarding such approval or the process for obtaining it. There is no evidence that the Director or his authorized agent has ever granted such approval. Nor is there any evidence or reason to believe that this exception is a remedy available to the ordinary park visitor. . Id. at A332 (State of Delaware Park Rules and Regulations, DNREC Division of Parks & Recreation, Effective May 26, 1977, § 10.01(f)). . Id. . 7 Del. Reg. 1768, 1780 (June 2004), available at App. to Appellants’ Opening Br. at A238, A250. . Id. The revision also added the word "by” to the clause "except those persons lawfully,” so the provision reads "except by those persons lawfully,” Id. . 7 Del. Admin. C. § 9201-21, available at App. to Appellants’ Opening Br. at A235. . App. to Appellants' Opening Br. at A428, A439 (State of Delaware Department of Agriculture State Forest Rules at ¶ 8); see id. at A198 (table of contents for Appendix B to letter dated Aug. 19, 2016, Agencies’ response to Superior Court’s request that "counsel provide the language of the Regulations governing firearms through the years, and the dates of any changes”) (providing dates for the Department of Agriculture State Forest Regulations and listing 1979 as the earliest such regulation). . 6 Del. Reg. 1201, 1204, § 7.9 (Mar. 1, 2003), available at App. to Appellants’ Opening Br. at A399. . 9 Del. Reg. 1425, 1429 at § 8.8 (Apr. 1, 2006), available at App. to Appellants’ Opening Br. at A392; see 10 Del. Reg. 88, 89 (July 1, 2006) (adopting proposed regulation), available at App. to Appellants’ Opening Br. at A387. . In re Request of Governor for an Advisory Opinion, 905 A.2d 106, 108 (Del. 2006). In District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the • United States Supreme Court emphasized the importance of surveying the relevant history in addition to the text when analyzing the ■ Second Amendment to the United States Constitution, the federal analogue to our Section 20. See also Wrenn v. District of Columbia, 864 F.3d 650, 658 (D.C. Cir. 2017) (noting that historical analysis is "essential for tracing the ‘pre-existing right’ embodied by . the [Second] Amendment” (quoting Heller, 554 U.S. at 592, 128 S.Ct. 2783) (emphasis in Heller)). In Wrenn, the D.C. Circuit criticized courts that have "dispensed with the historical digging” that Heller "makes essential to locating the Amendment’s edge, or at least its core.” 864 F.3d at 661. . Doe, 88 A.3d at 665. . Doe, 88 A.3d at 665 (emphasis in original). . Peruta v. California, — U.S. —, —, 137 S.Ct. 1995, 198 L.Ed.2d 746, 2017 WL 176580, at *1 (2017) (denying writ of certiora-ri), discussed infra at note 100. . Randy J. Holland, State Jury Trials and Federalism: Constitutionalizing Common Law Concepts, 38 Val. U. L. Rev. 373, 375 (2004). In Dorsey v. State, this Court held that "Dela-ware judges cannot faithfully discharge the responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in ‘lock step’ with the United States Supreme Court’s' construction of the federal Bill of Rights.” 761 A.2d 807, 814 (Del. 2000); see also Randy J. Holland, The Delaware State Constitution 36 (2d ed. 2017) ("The provisions in the federal Bill of Rights set only a minimum level of protection.”). . See, e.g., App. to Appellants' Opening Br. at *A91 (Defs.’ Reply Br. in Support of Defs.’ Mot. for Summary Judgment on the Pleadings and Answering Br. on Pis.’ Mot. for Judgment on the Pleadings) (“[T]he right extends beyond the home to a lesser'degree.”),' . Del. Const, art. I (Reserve Clause). Our dissenting colleagues accuse us of giving Section 20 a "federal coat of paint.” Dissent at 664. Yet they refuse to follow the recent unanimous, en banc decision of this Court in Doe\ they say they “disagree” with it and find the case "problematic.” Dissent at 698-99. It is troubling that the dissenters advocate ignoring the principles of stare- decisis and, instead, would base decisions on their own views of which of our fundamental rights are worth protecting. Such an approach, were it to be followed, would undermine the stability of our law. In addition, the dissenters ignore the Reserve Clause altogether, . The 1792 convention delegates unanimously approved the Declaratory Clause subjoined to the first Article, which provided: "WE declare that every Thing in this Article is reserved out of the general Powers of Government herein after mentioned.” Minutes of the Convention of the Delaware State 65 (Dover, Del., 1792 printed by Brynberg & Andrews), available at,RG 1115.000 House of Assembly Minutes and Proceedings, 1776-1791 Box # 6 (Dover, Del. Public Archives). . Article 30 of the 1776 Constitution provided: No article of the declaration of rights and fundamental rules of this state, agreed to by this convention, nor the first, second, fifth (except that part thereof that relates to the right of suffrage) twenty-sixth and twenty-ninth articles of this constitution, ought ever to be violated on any pretence whatever. No other part of this constitution shall be altered, changed or" diminish,ed, without the consent of five parts in seven of the Assembly, and' seven Members ‘of the Legislative Council. Del. Const, of 1776, art. 30 (emphasis added). . 293 A.2d 551 (Del. 1972). . Id. at 554. . Id. at 553. . See Del. Const, art. XVI, § 1. . 293 A.2d at 554. . Doe, 88 A.3d at 663. . Id. In addition to historically being an open carry state, Delaware is one of the overwhelming majority of states that permits concealed carry with a license. See 11 Del. C. § 1441. By pointing to a thirty-year period in the 1800s when concealed carry was prohibited in Delaware, our dissenting colleagues suggest that regulations effecting a total ban are thus permissible. See Dissent at 677. The dissenters almost entirely ignore that Dela-ware has permitted open carry since its inception. They miss that Delaware has always permitted some meaningful avenue to exercise the right to bear arms, whether that avenue be through open carry or concealed. The crucial fact here is that the Regulations allow for neither. Further, the better reading of the historical precedents shows that states have had flexibility to favor either mode (open or concealed carry) or both, and have run afoul of constitutionally protected rights to bear arms when they have banned both—as the Regulations do here. See, e.g., Nunn v. State, 1 Ga. 243 (Ga. 1846), for example, where the Georgia Supreme Court upheld a concealed carry ban, that court also stated that a statute ■ that banned both open and concealed cariy "is in conflict with the Constitution, and void.” Id. at 251; see also State v. Reid, 1 Ala. 612, 616-617 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.”); Bliss v. Com., 12 Ky. 90, 91 (1822) (suggesting that a regulation that "import[s] an entire destruction of the right of the citizens to bear arms in defense of themselves and the state” would be plainly unconstitutional). Moreover, the dissent's references to the Northampton statute (originating in 1328), see Dissent at 672, 673, are "neutralized” by Heller, as the Wrenn court concludes; “[ejarly commentators seem to confirm that whatever Northampton banned on the shores of England or colonial America, the right to bear arms by the time of the Founding was thought to protect carrying for self-defense generally.” 864 F.3d at 660. . Doe, 88 A.3d at 663 (citing Heller, 554 U.S. at 595, 128 S.Ct. 2783 (quoting 1 Blackstone's Commentaries 145-46 n.42 (1803) (alteration in original))). . An Act for Establishing a Militia in this Government (passed Nov. 5, 1757) (italics supplied), microformed on RG 1111.000 Legislative Papers, 1731-1775 (Dover, Del. Public Archives); see also An Act for Establishing a Militia in this State (passed Feb. 22, 1777) (Wilm., Del., James Adams 1777) (emphasis added), available at IMP F161.31.A21 R28 M64 (Wilm., Del., Del. Historical Soc’y Archives): WHEREAS Self-Preservation is the first Principle and Law of Nature, and a Duty that every Man indispensably owes not only to himself but to the Supreme Director and Governor of the Universe who gave him a Being: AND WHEREAS in a State of Political Society and Government all Men by their original Compact and Agreement are obliged to unite in defending themselves, and those of the same Community, against such as shall attempt unlawfully to deprive them of their just Rights and Liberties; and it is apparent that without Defence no Government can possibly subsist: [[Image here]] FOR PREVENTION whereof, and that the Inhabitants of this State may be armed, trained and disciplined in the Art of War, whereby they may be enabled not only to assert their just Rights but also to defend themselves, their Lives and Properties, and preserve inviolate that Freedom they derived from their Ancestors and the Constitution, and transmit the fair Inheritance to their Posterity; (emphasis in original and added). The Second Amendment’s reference to "[a] well regulated Militia” in its prefatory clause—and the root of the written right to keep and bear arms in various militia acts— has led some to believe that the right's apparent tie to the militia somehow limits the scope of the right to bear arms to the "right to possess and carry a firearm in connection with militia service.” Heller, 554 U.S. at 577, 128 S.Ct. 2783 (emphasis added). However, the close textual, contextual, and historical exegesis in Heller confirms that the prefatory clause "announces the purpose for which the right was codified: to prevent the elimination of the militia,” but not to limit the scope of the operative clause stating the right itself. Id. at 599, 128 S.Ct. 2783. "[T]he threat that the new Federal Government would destroy the citizens’ militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution.” Id. And, as Heller noted, though "self-defense had little to do with the right's codification; it was the central component of the right itself.” Id. (emphasis in original). . Doe, 88 A.3d at 663 (quoting Heller, 554 U.S. at 594, 128 S.Ct. 2783); see also, Samuel Adams, The Rights of the Colonists as Men (Nov. 20, 1172), reprinted in The Constitution of the United States of America and Selected Writings of the Founding Fathers (2012) at 19. (“Among the natural rights of the colonists are these: First, a right to life. Second, to liberty. Thirdly, to property; together with the right to support and defend them in the best manner they can. These are evident branches of, rather than deductions from, the duty of self-preservation, commonly called the first law of nature.”). . Del. Const, of 1776 art. 25 ("The common law of England, as well as much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, agreed to by this convention.”). This Court has repeatedly held that Delaware law indudes the English common law as it existed 'in 1776, except where it has been clearly ' modified by our statutory law. See Del. Const. of 1897, Schedule § 18; Quillen v. State, 110 A.2d 445, 450 (Del. 1955) (“Apart from statute[,] our law is in general the common law of England as it existed in 1776 ....”); Steele v. State, 151 A.2d 127, 130 (Del. 1959) ("Except as insofar as it has been found to be inconsistent with our statutory law, the common law of England is part of the law of this state. It was first adopted in the Constitution of 1776, Article 25. The same section was reenacted in each of the three succeeding constitutions: Constitution of 1792, Article VIII, Section 10; Constitution of 1831, Article VII, Section 9; and in our present Constitution of 1897, Schedule,. § 18.“). In contrast to Doe and Heller, the dissent ignores the English common law heritage at the time of our state's early history that was expressly incorporated into our laws and, puzzlingly, focuses on “the state of firearm regulation in England as of 1977.” Dissent at 679. That discussion is irrelevant. . Heller, 554 U.S. at 593, 128 S.Ct. 2783 (citing Edward Dumbauld, The Bill of Rights arid What It Means Today 51 (1957); William Rawle, A View of the Constitution of the United States of America 122 (1825)). . Heller, 554 U.S. at 593, 128 S.Ct. 2783 (quoting 1 W, & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). . Id. (emphasis added). . Id. at 599, 628, 128 S.Ct 2783. Further, Chancellor James. Kent wrote in his 1826 Commentaries on American Law: The municipal law of our own . ’.. country!] has likewise left: with individuals the exercise of the natural right of sélf[-]de-fence, in all those cases in which the law is either too slow or too feeble to stay the hand of violence. [...] The right of self-defence in these cases is founded on the law of nature, and is not, and cannot be superseded by the law of society. James Kent, 2 Commentáries on American Law, Part TV: Of the Law Concerning the Rights of Persons 15 (2d ed. O, Halsted 1832). . Votes and Proceedings of the House of Assembly of the Delaware State 21, 39 (Wilm., Del., 1790 printed by James Adams), micro-fonned on RG 1115.000 House of Assembly Minutes and Proceedings, 1776-1791 (Dover, Del. Public Archives). . See Minutes of the Grand Committee of the Whole Convention of the Delaware State (Wilm., Del, 1792 printed by James Adams), reprinted in Proceedings of the House of Assembly of the Delaware State 1781-1792 and of the Constitutional Convention of 1792, at 777; Claudia L. Bushman, Harold B, Hancock, & Elizabeth Moyne Hornsey, Introduction to Proceedings of the House of Assembly of the Delaware State 1781-1792 and of the Constitutional Convention of 1792, at 35. . Doe, 88 A.3d at 663. . See 3 Documentary History of the Ratification of the Constitution, 56 (Merrill Jensen, ed. State Historical Society of Wisconsin 1978). The first state elections under the 1776 Constitution "were characterized by violence, especially in Sussex County.” Id. at 39. The Tories prevailed in Sussex County, possibly because "[a]rmed Tories had driven Whigs from the polls ....” Id. Whig leaders Caesar Rodney and Thomas McKean (two of three of Delaware’s delegates to the Continental Congress who voted in favor of independence) lost their campaigns, "but the next year the Whigs retaliated in land and won control” of the General Assembly, which then elected Rodney president, a role comparable to that of governor. Id. In 1778 "the Whig-controlled legislature adopted an act denying political rights to those who refused to take oaths of allegiance to the state, and an act confiscating Tory property.” Id. By 1786 the Tories had regained control. Id. . Doe, 88 A.3d at 663. . See Documentary History of the Ratification of the Constitution, supra nóte 70, at 56; John A. Munroe, Delaware and the Constitution: An Overview of Events Leading to Ratification, 22 Del. Hist. 219-38 (1987-88), reprinted in The Philadelawareans and Other Essays Relating to Delaware 250, 261-64 (2004). . Petition (Oct. 20, 1787), reprinted in Documentary History of the Ratification of the Constitution, supra note at 70, at 64-65. . The legislature resolved the issue when it voided the election results and scheduled a new Sussex County election for November 26, 1787. The statewide election of delegates to the ratification convention (for the United States Constitution) was to occur the same day. The result was a "Tory victory” in Sussex County.. The Whigs unsuccessfully petitioned the legislature to challenge the election results. Documentary History of the Ratification of the Constitution, supra note 70, at 41; see also id. at 92-93. . Doe, 88 A.3d at 663. The U.S. Supreme Court similarly explained that, during that time, rival parties agreed on at least one thing: "Antifederalists and Federalists alike agreed that the right to bear arms was fundamental to the newly formed system of government,” McDonald v. City of Chicago, 561 U.S. 742, 769, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010); see also Documentary History of the Ratification of the Constitution, supra note 70, at 39 ("The animosity among political leaders and the violence on election days were probably unmatched in any other state, but at the same time Delawareans seemed remarkably united in their attitude toward other states and the government- of the United States.”). . Del. Const, of 1792 pmbl.; Minutes of the Convention (Wilm. Del., 1792 printed by Peter Brynberg & Samuel Andrews), supra note 50, at 918. . Del. Const, of 1831 pmbl.; Del, Const, of 1897 pmbl. (current constitution). The dissenters' reference to a few laws from the 1800s prohibiting the discharge of firearms within town limits, see Dissent at 673-74, does not demonstrate a longstanding tradition of banning the possession of firearms. Commenting on similar laws, the majority in Heller noted such laws "provide no support for the severe restriction in the present case.” 554 U.S. at 632, 128 S.Ct. 2783. . Doe, 88 A.3d at 663. . See House Debate on H.B. 554 at 1:26, 3:56, 133d Gen. Assem. (May 22, 1986); Sen. Debate on H.B. 30 at 35:30, 38:00, 41:15, 134th Gen. Assem. (Apr. 16, 1987). For example, in Hetherton v. Sears, Roebuck & Co.—a 1981 opinion alluded to in the Section 20 legislative debates—the Third Circuit suggested as dicta that the right to own a gun is not a "fundamental right" and that "Delaware could ban the sale of all deadly weapons” and that the State had the "power to effect a total ban” if it so chose. 652 F.2d 1152, 1157-58 (3d Cir. 1981). Further, several decisions had held that the Second Amendment did not apply to the states. See, e.g., Quilici v. Morton Grove, 695 F.2d 261, 270 (7th Cir. 1982). At oral argument, the State agreed that this uncertainty prompted die enactment of Section 20: STATE: [C]learly the Second Amendment was in existence, but there was some question—even in 1987—as to whether it conferred an individual right, and whether it could be applied to the states. COURT: And wasn’t that the impetus for Section 20? STATE: That’s right. Oral Argument at 35:59, https://livestream. com/accounts/5969852/events/7714841/ videos/162711371/player. . Del. H.B. 554 syn., 133d Gen. Assem. (1986) (emphases added). . Del. H.J., 133d Gen. Assem. 269 (1986). . Del. S.J., 133d Gen. Assem. 342 (1986) (recording eighteen yeas, one nay; one abstention; one absence). . Del, H.J., 134th Gen. Assem. 15 (1987); Del. H.B. 30 syn., 134th Gen. Assem. (1987) (emphases added). . House Administration Committee Meeting Minutes at 2 (Apr. 1, 1987). . See House Debate on H.B. 30 at 1:00, 134th Gen, Assem. (Apr. 2, 1987); Del. HJ., 134th Gen. Assem. 44 (1987) (recording that, with the exception of one absent member, the House unanimously voted in favor of H.B. 30); Sen. Debate on H.B. 30 beginning at 1:00, 134th Gen. Assem. (Apr. 16, 1987) (indicating that the Senate debated H.B. 30 for nearly an hour); Del. S.J., 134th Gen. Assem. 56 (1987) (recording seventeen yeas, one nay; one abstention; and two absences). The dissenters’ citations to cherry-picked quotations of a few individual legislators do not undermine the clear text of Section 20 or detract from its stated purpose of explicitly protecting the traditional right to keep and bear arms. The dissent boldly purports to know the intentions of the members of the General Assembly, our governors, and representatives in Congress in asserting that á "bipartisan consensus” supports classifying parks as "sensitive places” where guns should be banned. See Dissent at 663-64, 664-66, 666-67, 706-07, 712. But, in addition to being contradicted by the actual legislative history from the time of Section 20's passage and Section 20’s text, that assertion is belied by—among other things—the amicus brief filed on behalf of numerous members of the General Assembly who contend that the Agencies have "overstepped their mandate by issuing and enforcing regulations that state law preempts and that are outside the scope of the authority the General Assembly delegated to them.” Amicus Br. at 2. . Doe, 88 A.3d at 664 n.37 (“A fundamental right has been defined as a right that is guaranteed either explicitly or implicitly by the constitution." (citing San Antonio Ind. Sch. Dist. v. Rodriguez, 411 U.S. 1, 33-34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973))). . 554 U.S. at 581, 583-84, 128 S.Ct. 2783 (finding that the phrase “right of the people” as used in the Second Amendment meant that the right "is exercised individually,” as opposed to being a collective right belonging to a militia; " '[k]eep arms’ was simply a common way of referring to possessing arms, for militiamen and everyone else”; and “bear” meant "carry") (emphasis in original) (citations omitted). . Id. at 629, 128 S.Ct. 2783. Heller addressed a challenge to a District of Columbia statute that banned entirely the possession of handguns in the home and required that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable. Id. at 574, 128 S.Ct. 2783. . See 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (In his majority opinion, at 758-59,. Justice Alito observed that the Su- , premé Court had “never previously addressed the question whether the right to keep and bear arms applies to the States under [the Due Process Clause] theory"). . Id. at 768, 130 S.Ct. 3020 (citation omitted) (internal quotation marks omitted). . Id. at 767, 130 S.Ct. 3020 (quoting Heller, 554 U.S. at 599, 128 S.Ct. 2783) (footnote omitted). . Heller, 554 U.S. at 592, 128 S.Ct. 2783 (“[I]t has always been widely'understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right” and observing that "[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it ‘shall not be infringed.’ ”) (emphasis in original); McDonald, 561 U.S. at 757, 130 S.Ct. 3020 (“[T]he right of bearing arms for a lawful purpose ‘is not a right granted by •the Constitution’ and is not ‘in any manner dependent upon that instrument for its existence.’ ” (quoting United States v. Cruikshank, 92 U.S. 542, 553, 23 L.Ed. 588 (1875))). The Third Circuit now adheres to the post-Heller view that the "Second Amendment protects an individual’s right to possess a firearm ‘unconnected with militia service.’ ” Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 343, 357 (3d Cir. 2016) (quoting Heller, 554 U.S. at 582, 128 S.Ct, 2783) (view expressed in two plurality opinions accounting for majority of the en banc Third Circuit), cert. denied sub nom. Sessions v. Binderup, — U.S. —, 137 S.Ct. 2323, 198 L.Ed.2d 746 (2017), and cert. denied sub nom. Binderup v. Sessions, — U.S. —, 137 S.Ct. 2323, 198 L.Ed.2d 746 (2017)). The Third Circuit also noted that McDonald confirms that the Sec- ’ ond Amendment applies to the states through the Fourteenth Amendment "because the right is ‘fundamental’ to ‘our system of ordered liberty.’" Id. at 346 (quoting McDonald, 561 U.S. at 778, 791, 130 S.Ct. 3020). . Heller, 554 U.S. at 592, 128 S.Ct. 2783 ("This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed.” (quoting United States v. Cruikshank, 92 U.S. 542, 553, 23 L.Ed. 588 (1875))) (internal quotation marks omitted). . Id. at 599-600, 128 S.Ct. 2783 (quoting Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897)). . Id. at 593, 128 S.Ct. 2783 (citation omitted). As with Doe, our dissenting colleagues refuse to accept Heller and McDonald as valid and binding law. Although they acknowledge that this Court in Doe embraced both Heller and McDonald and read them into the Dela-ware Constitution, see Dissent at 668, the dissenters dispense with the "bare Heller majority” as "odd” in recognizing the pre-exist-ing right to keep and bear arms. Dissent at 694 n. 195. The dissenters argue that, "in the name of originalism,” the Heller majority "has denuded the text of the Second Amendment of any meaning as to its most evident meaning .” Id. The dissenters thus refuse . to recognize the holdings in either Doe or Heller as having any real force and denigrate these decisions as the product of “novel principles of federal constitutional law favored by gun rights advocates ....” Id. at 713. . Heller, 554 U.S. at 593-94, 128 S.Ct. 2783. . Id. at 594, 128 S.Ct. 2783 (quoting 1 Blackstone’s Commentaries 145, 145-46 n.42 (1803)). In The Second Amendment in_ the Nineteenth Century, David Kopel notes that ‘‘[t]he first scholarly analysis of the Second Amendment is found in St. George Tucker’s American edition of Blackstone’s Commentaries, published in 1803.” David B. Kopel, The Second Amendrmnt in the Nineteenth Century, 1998 B.Y.U.L. Rev. 1359, 1370 (1998) (citing William Blackstone, Commentaries (St. George Tucker ed,, Lawbook Exchange, Ltd. 1996) (1803)). Tucker wrote of the Second Amendment that: “This may be considered as the true palladium of liberty .... The right of self defence is the first law of nature ....” Id. at 1377 (footnote omitted). . An Act for Establishing a Militia in this Government (passed November 5, 1757), mi-croformed on RG 1111.000 Legislative Papers, 1731-1775 (Dover, Del. Public Archives). . As the Court observed in Dorsey v. State, ”[p]rior to the American Revolution, many aspiring colonial attorneys traveled to London to study law at the Middle Temple or one of the other English Inns of Court.” 761 A.2d 807, 816 (Del. 2000). Following their legal studies, they returned to practice law in colo'nial America. Id. Further, ”[t]he President of the 1792 Delaware Constitutional Convention was John Dickinson, who had studied the common law of England at the Middle Temple in London with Thomas McKean and, thus, was also a contemporary of William Blackstone.” Id. at 817. . Peruta v. California, — U.S. —, 137 S.Ct. 1995, 1999, 198 L.Ed.2d 746 (2017) (denying writ of certiorari) (Thomas, J., dissenting): see also Wrenn, 864 F.3d at 657 (”[T]he [Second] Amendment’s ‘core lawful purpose’ is self-defense, and the need for. that might arise beyond as well as within the home.” (quoting Heller, 554 U.S. at 630, 128 S.Ct. 2783)). Heller suggests that the Second Amendment protects the right to bear arms outside the home. First, Heller determined that “keep arms” and "bear arms” have distinct meanings. To “bear- arms” means to “wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person," suggesting that the right is exercised in transit so one may be ready at all times, and not merely at home. Drake v. Filko, 724 F.3d 426, 444 (3d Cir. 2013) (Hardiman, J., dissenting) (quoting Heller, 554 U.S. at 584, 128 S.Ct. 2783) (alterations omitted) (internal quotation marks and citation omitted). Second, Heller determined that the Second Amendment protects an, inherent right to self-defense, Id. (citing Heller, 554 U.S. at 599, 628, 128 S.Ct. 2783); see also supra note 60. Conflicts obviously can arise outside of the home, and in some circumstances, a person may be more vulnerable in a public place than at home. Third, the Heller Court's statement that “the need for defense of self, family, and property” is "most acute” in the home, 554 U.S. at 628, 128 S.Ct. 2783 (emphasis added), suggests that the need must be less acute elsewhere—-but nonetheless present. Drake, 724 F.3d at 444. Fourth, the Heller Court acknowledged that "[i]t was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down.” 554 U.S. at 599, 128 S.Ct. 2783. Finally, ”[t]he prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting.” Id. Hunting and serving in a militia both involve activities outside the home. Accordingly, Heller suggests that the Second Amendment right extends beyond the confines of one’s home and is thus part of the “baseline” protection afforded to the citizens of Delaware; see also Wrenn, 864 F.3d at 659 ("[T]he [Second] Amendment's core generally covers carrying in public for self-defense.”). . See Doe, 88 A.3d at 665. . Griffin v. State, 47 A.3d 487, 488 (Del. 2012). . 11 Del. C. § 1444. . 10 Del. C. § 1045(a)(8). . 11 Del. C. § 1460. . See Hazout v. Tsang Mun Ting, 134 A.3d 274, 287 (Del. 2016) ("[Blanket judicial invalidation of a statute’s words should not ensue if the statute can be applied constitutionally in a wide class of cases, but might operate overbroadly in some more limited class of cases.”). . See Doe, 88 A.3d at 668 (“We recognize that where the government is a proprietor or employer, it has a legitimate interest in controlling unsafe or disruptive behavior on its property. But [the State] has conceded that after McDonald, as a landlord it may not adopt a total ban of firearms.”); Bailey v. Philadelphia, W. & B.R. Co., 4 Del. 389, 389 (1846) (“The State has the right of a proprietor over navigable streams entirely within its borders; and may obstruct, or (unless where restricted by the Constitution of the United States,) may close up, such streams at pleasure.”) (emphasis added); Int’l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 687, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (“The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints.”) (internal citations and quotation marks omitted); id. at 696, 112 S.Ct. 2701 (Kennedy, J., concurring) (joined by Black-mun, Stevens, and Souter, JJ.) ("A fundamental tenet of our Constitution is that the government is subject to constraints which private persons are not.”). . Case law does not support the dissenters’ novel position, not even argued by the State, that the government may "regulate firearm possession and use on its own property, like any other proprietor may.” Dissent at 667 (emphasis added). We do not disagree that the government may regulate firearms. But the distinction missed throughout the dissent is that, unlike private proprietors who are given more flexibility in certain circumstances, the State must comply with the Constitution when enacting laws and regulations that interfere with the exercise of fundamental rights on its property. See supra note 107; Marsh v. Alabama, 326 U.S. 501, 506, 66 S.Ct. 276, 90 L.Ed. 265 (1946) ("Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.”). Further, Light v. United States, 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911), cited in the dissent, see Dissent at 673-74, stands for the unremarkable proposition that the government may forbid cattle from grazing on its land without a permit; no fundamental constitutional rights were at issue. See id. at 537, 31 S.Ct. 485. Davis v. Massachusetts, 167 U.S. 43, 17 S.Ct. 731, 42 L.Ed. 71 (1897), another case relied on by the dissenters for their novel theory, has been expressly rejected by the United States Supreme Court and, thus, is no longer good law. See Jamison v. State of Tex., 318 U.S. 413, 415-16, 63 S.Ct. 669, 87 L.Ed. 869 (1943) (noting that the argument based on Davis that the state "has the power absolutely to prohibit the use of the streets for the communication of ideas” has been “directly rejected by this Court”). In its briefs and at oral argument, the State’s counsel agreed that the Regulations must comply with Section 20 and should be subject to intermediate scrutiny. . See Heller, 554 U.S. at 629, 128 S.Ct. 2783. . 864 F.3d 650, 665 (D.C. Cir. 2017) (quoting Heller, 554 U.S. at 629, 128 S.Ct. 2783). . Id. . Id. at 655, 128 S.Ct. 2783 (quoting D.C. Code § 22-4506(a)-(b)) (citing D.C. Code § 22-4504.01)). . Id. at 665, 128 S.Ct. 2783. . See Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir. 2011); Peruta v. Cty. of San Diego, 742 F.3d 1144, 1170 (9th Cir. 2014) ("[T]he rare law that 'destroys' the [core Second Amendment] right” necessitates "Heller-style per se invalidation.”), rev’d on reh’g en hanc, 824 F.3d 919 (9th Cir. 2016). . See Doe, 88 A.3d at 666-67 (“The General Assembly's careful and nuanced approach [of leaving in place a series of statutes affecting the right to keep and bear arms in Delaware] supports an intermediate-scrutiny analysis that allows a court to consider public safety . and other important governmental interests,”). . Id. at 657-58. . U.S. Census Bureau, District of Columbia: 2010—Population and Housing Unit Counts, U.S.- Dep't. of Commerce 13 (June 2012), https ;//www. census. gov/prod/cen2 010/ ■ cph-2-10.pdf (listing the District of Columbia’s total area as 68.34 square miles, which is 43,737.6 acres). . See U.S. Census'Bureau, 2017 Gazetteer Files, U.S. Dep’t of Commerce, https://www2. census.gov/geo/docs/maps-data/data/gazetteer/ 2017_Gazetteer/2017_gaz_place_l O.txt (listing Wilmington’s total land area as 10.90 square miles, which is 6,976 acres, and total water area as 6.04 square miles, which is 3,866 acres) [hereinafter Gazetteer]. . See Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 346 (3d Cir. 2016) (collecting cases). . 614 F.3d 85 (3d Cir. 2010). . Id. at 89. ., Id. For example, in Marzarella, the Third Circuit was evaluating the prohibition of possession of a firearm with a destroyed serial number under 18 U.S.C. § 922(k). Id. at 92. Given that "[t]he burden imposed by the law does not severely limit the possession of firearms,” the court applied intermediate scrutiny and found the law survived because,, "even if it burden[ed] protected conduct,” § 922(k) reasonably served an important "law enforcement interest in enabling the tracing of weapons via their serial numbers.” Id. at 95, 97-98. . Ezell, 651 F.3d at 703; Tyler v. Hillsdale Cty. Sheriffs Dep’t, 837 F.3d 678, 690 (6th Cir. 2016) ("Given Heller's focus on 'core' Second Amendment activity, our choice of scrutiny level should be informed by (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law’s burden on the right.” (quoting United States v. Chovan, 735 F.3d 1127, 1138 (9th Cir. 2013)) (internal quotation marks and citation omitted); Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 195 (5th Cir. 2012) (“A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing.”). . Heller v. District of Columbia, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("[A] regulation that imposes a substantial burden.upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes -a less substantial burden should be proportionately easier to justify.”). . United States v. Chester, 628 F.3d 673, 682-83 (4th Cir. 2010) (applying intermediate scrutiny to 18 Ü.S.C. § 922(g)(9), barring convicted felons from possessing firearms, because the Second Amendment’s core protects "the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense”) (emphasis in original); United States v. Skoien, 614 F.3d 638, 642 (7th Cir. 2010) (observing that "[bjoth logic and data establish a substantial relation between § 922(g)(9)” and its important governmental objective of "preventing armed mayhem,” so . the court “need: not get more deeply into the ‘levels of scrutiny’ quagmire”); United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to -18 U.S.C. § 922(g)(8), which bans possession of firearms by those who "based on their past behavior, are more likely to engage in domestic violence”); United States v. Mahin, 668 F.3d 119, 124 (4th Cir. 2012) (same); Tyler v. Hillsdale Cty. Sheriffs Dep’t, 837 F.3d 678, 691 (6th Cir. 2016) (applying intermediate scrutiny to 18 U.S.C. § 922(g)(4) because it "does not burden the public at large; it burdens only a narrow class of individuals who are not at the core of the Second Amendment—those previously adjudicated mentally defective or previously involuntarily committed”); Nat'l Rifle Ass’n of Am., Inc., 700 F.3d at 205 (applying intermediate scrutiny to ban on firearm sales under 18 U.S.C. § 922(b)(1) and (c)(1) because the statutes "do[] not disarm an entire community, but instead prohibits commercial handgun sales to 18-to-20-year-olds—a discrete category”). . See Doe, 88 A.3d at 666-67. . Id. at 667. . App. to Appellants’ Opening Br. at A45 (Defs.’ Opening Brief in Support of Mot. for Judgment on the Pleadings); see also id. at A40, A42 ("The Defendants have undertaken an obligation, pursuant to authority delegated by the legislature, to provide security and to punish any violators. A critical component of that public safety obligation has been the regulation of firearms, with the explicit authority and implicit blessing of the General Assem- ■ bly”). . Id. at A47. . Id. at A76. . Doe, 88 A.3d at 668. The dissent repeatedly and mistakenly assigns the burden of proof to Appellants. See, e.g., Dissent at 667, 701-02, 705-06. This is yet another example of the dissenters’ refusal to follow this Court’s precedent, . 11 Del. C. § 1256; see id. § 1258(1) (defining ”[c]ontraband”). . 11 Del. C. § 1457(a) provides: (a) Any person who commits any of the offenses described in subsection (b) of this section) [listing independent criminal offenses such as carrying a concealed deadly weapon without a license], or any juvenile who possesses a firearm or other deadly weapon, and does so while in or on a “Safe School and Recreation Zone" shall be guilty of the crime of possession of a weapon in a Safe School and Recreation Zone. (emphasis added). . See 9 Del. C. § 330(c)-(d); 22 Del. C. § lll(a)-(b). . See 9 Del. C. § 330(d)(6) ("An ordinance adopted by the county government shall not prevent the following in county buildings or police stations: ... (6) Carrying firearms and ammunition by persons who hold a valid license pursuant to either § 1441 or§ 1441Aof Title 11 so long as the firearm remains concealed except for inadvertent display or for self-defense or defense of others ....”); 22 Del. C. § 111(b)(6) (providing the same restriction as 9 Del. C. § 330(d)(6) for municipalities). .Redden State Forest is over 12,400 acres, see Forest Service, Delaware State Forests, Del. Dep’t of Agriculture, http://dda.delaware. gov/forestry/forest.shtml, whereas the City of New Castle is 2,630.4 acres, see Gazetteer, supra note 118. To put this point into further perspective, Cape Henlopen State Park is 5,195 acres. See Cape Henlopen State Park, Del. State Parks, http://www.destateparks. com/park/cape-henlopen/history.asp. Dela-ware Seashore State Park (2,825 acres) is about the size of Bridgeville (2,964 acres). See Delaware Seashore State Park, Del. State Parks, http://www.destateparks.com/park/ delaware-seashore/; Gazetteer, supra note 118. Brandywine Creek State Park (933 acres) is roughly triple the size of South Bethany (332 acres). See Brandywine Creek State Park, Del. State Parks, http://www.destate parks.com/parli/brandywine-creek/; Gazeteer, supra. Several other parks dwarf,- in size, many small towns such as the Town of Magnolia (125 acres). See Gazetteer, supra note 118. . Moore v. Madigan, 702 F.3d 933, 940 (7th Cir. 2012). . At oral argument, the State said, "[T]he State, is, not .seeking to take anyone’s guns away, by banning guns in most circumstances from Parks and Forests. Rather, this ... case is about asking folks to leave their guns at home when they go to those places, with the exception of hunting season and recreational shooting.” Oral Argument at 23:49, ]ittps://live stream, com/acconnts/5969852/events/ 7714841/videos/l 62711371/player. . . Doe, 88 A.3d at 665. . Heller, 554 U.S. at 626-27, 128 S.Ct. 2783 (‘‘[N]othing in our opinion should be taken to cast doubt on ... laws forbidding the carrying of firearms in sensitive places such as schools and government buildings!.]”); Doe, 88 A.3d at 668 (recognizing-that firearm possession might be restricted at ‘‘a state office building, courthouse, school, college, or university”). . The federal, approach recognizes sensitive areas within its parks and does not protect possession of firearms in visitors’ centers or rangers’ offices because possession of firearms in federal buildings is prohibited by statute. See 18 U.S.C. § 930; cf. United States v. Bundy, 2016 WL 3156309, at *4 n.3 (D. Or. June 3, 2016) (citing Heller, 554 U.S. at 626 n.26, 128 S.Ct. 2783) (holding that 18 U.S.C. § 930 does not violate the Second Amendment); see also 54 U.S.C, § 104906(b) (barring the Secretary of the Interior from promulgating any regulation that restricts Second Amendment rights beyond other state and federal laws). Thus, the federal scheme appears to contemplate "sensitive areas” within National Parks—but not the entirety of the parks. Although our State is certainly free to reach different conclusions than the Federal Government on various matters, including this one, we find the State’s "public safety” justification for a total ban particularr ly dubious on this sparse record—especially given that Congress has taken the opposite approach. Congress barred the Secretary of the Interior, whose jurisdiction includes the National Parks, from creating or enforcing any regulations that might restrict an individual’s right to possess firearms to a greater extent than other federal láws or the laws of the state in which each park sits. See 54 U.S.C, § 104906(b). In passing, this legislation in 2009, Congress expressly stated that its purpose was "to ensure that unelected bureaucrats and judges cannot again 'override the Second Amendment rights of law-abiding citizens on 83,600,000 acres of National Park System land and 90,790,000 acres of land under the jurisdiction of the United States Fish and Wildlife Service.” Credit Card Accountability Responsibility and Disclosure Act of 2009, PL 111-24 § 512(a)(7), May 22, 2009, 123 Stat. 1734, 1765; 123 Stat. at 1765, It also stated that ”[t]he Federal laws should make it clear that the second amendment rights of an individual” in such parks "should not be infringed,” Id. at § 512(a)(8). Notably, our First State National Historical Park land, which now includes 1,100 acres in New Castle County, permits lawful firearms as a result of this legislation. See First State— Frequently Asked Questions, Nat’l Park Serv. (last updated Mar. 15, 2017), https://www. nps.gov/frsl/faqs.htm. . The State confirmed that the Agencies believe that every acre of State Parks and State Forests should count as a "sensitive place” because it would be hard to draw a line between what should be "sensitive” and what should not be. Oral Argument at 47:26, https ://livestream. com/accounts/5969852/ events/7714841/videos/l 62711371/player. That argument itself seems to admit that there are some places that should not otherwise count as sensitive places. If the Federal Government is able to undertake this sort of line drawing in its parks, there is no reason why the State’s Agencies cannot do the same to comply with Section 20 and the Second Amendment. . Appellants claim that, as of 2010, there were only 21 park rangers for the entirety of Delaware Park lands. Appellants’ Opening Br. at 28 n.22. . 7 Del. Admin. C. § 9201—7.5; App. to Appellants' Opening Br. at A372. . Doe, 88. A.3d at 668. . See, e.g., Wrenn, 864 F.3d at 671 n.5 (“As we’ve noted, text and history and precedent urge that the Second Amendment requires governments to leave responsible citizens ample means for self-defense at home and outside.”). •■ ■ ■ . In Wrenn, the D.C. Circuit court rejected the proposition that "densely populated or urban areas” such as Washington, D.C., might count as sensitive places that would justify restricting the right to carry. Id. at 660; see id. at 668 (granting preliminary injunction enjoining enforcement of the so-called "good reason" law because plaintiffs were likely to succeed on the merits of their argument that the law violated the Second Amendment on its face). .Del. S.B. 45 syn., 148th Gen. Assem. (2015). See also Senate Debate on S.B. 45, 148th Gen. Assem. (May 7, 2015); House Debate on S.B. 45 at 1:15, 148th Gen. Assem. (July 1, 2015). Nor is there any evidence that the reclassification—or declassification—of penalties in 2016 was intended to ratify the Regulations implicitly. See Dissent at 701 n.243 and accompanying text. The General Assembly authorized the "declassification" of “minor violations associated with state parks” from unclassified misdemeanors to class D environmental violations so that the first of such infractions would not be reported on criminal history records and run the risk of impacting the job prospects of one-time offenders. Del. S.B. 114 syn., 148th Gen. Assem. (2015); Minutes of Sen. Nat. Res. and Bnvtl. Control Comm. Meeting, 148th Gen. Assem. (June 17, 2015), at 3-4. At the House Natural Resources Committee Meeting to consider the bill, the Deputy Director of DNREC responded to one member's inquiry about the types of violations that were to be declassified; “[s]he cited a number of specific examples including failure to purchase a surf fishing permit and failure to pay an entrance fee." Minutes of House Nat. Res. Comm. Meeting, 148th Gen. Assem. (June 25, 2015), at 1. . As Heller observed, "[t]he very enumeration of the right takes it out of the hands of government ... the power to decide on a case-byTcase basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges’ assessments of its usefulness is no constitutional guarantee at all.” 554 U.S. at 634, 128 S.Ct. 2783. . 29 Del. C. § 10141(e). . Office of the Comm’r, Del. Alcoholic Beverage Control v. Appeals Comm’n, Del. Alcoholic Beverage Control, 116 A.3d 1221, 1226 (Del. 2015) (citing Wilm. Vitamin & Cosmetic Corp. v. Tigue, 183 A.2d 731, 740 (Del. Super. Ct. 1962)). . New Castle Cty. Council v. BC Dev. Assocs., 567 A.2d 1271, 1275 (Del. 1989). . Atlantis I Condo. Ass’n v. Bryson, 403 A.2d 711, 713 (Del. 1979) (emphasis added). . 7 Del. C. § 4701(a)(4). . 29 Del. C. § 8003(7) (emphasis added). . 3 Del. C. § 1011. . Id. § 101(3). Although the Regulations are also challenged on the basis of preemption, we question whether that doctrine is directly applicable here. " ‘Preemption’ refers to circumstances where the law of a superior sovereign takes precedence over the laws of a lesser sovereign; for example, a federal law preempting a state law or a state law preempting a city or county ordinance.” A.W. Fin. Servs., S.A. v. Empire Res., Inc., 981 A.2d 1114, 1121 (Del. 2009). Instead, this appears to be a clear case of an agency exceeding its authority by violating its directive to comply with the State’s laws—which necessarily includes the Constitution. .DNREC has recognized the narrow scope of its power. See 7 Del. Admin. C. § 9201-2.1 (DNREC may "adopt only those minimal Rules and Regulations that are essential to the protection of Park resources and improvements thereto and to the safety, protection, and general welfare of the visitors and personnel on properties under its jurisdiction.”). . As to our dissenting colleagues, we ignore many of their comments suggesting that any law, constitutional provision, or decision announcing or upholding the rights to keep and bear arms—including Section 20, Doe, and Heller—must be discounted as the product of a politically motivated, NRA-driven agenda. Biit we do pause to observe that the dissent’s approach—were it to have been the law— would have troubling implications beyond this case. If, as they posit, agency regulations (such as those eviscerating fundamental Section 20 rights) are immune from any constitutional scrutiny, what principles could the Court then invoke if an agency were to ban the press from open meetings, or limit political or other speech in such areas?